**EXHIBIT 7**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| POLICE OFFICER TONY GARZELLA, | : No. 05-1626 |
| Plaintiff | : Civil Action |
| | : |
| vs. | : |
| | : |
| BOROUGH OF DUNMORE, BOROUGH OF DUNMORE COUNCIL, BOROUGH OF DUNMORE CIVIL SERVICE COMMISSION, MICHAEL CUMMINGS, Individually and as Councilman, JOSEPH LOFTUS, Individually and as Borough Manager, THOMAS HENNIGAN, Individually and as Councilman, JOSEPH TALUTTO, Individually and as Councilman, LEONARD VERRASTRO, Individually and as Councilman, JOHN BARRETT, Individually and as Civil Service Commissioner, WILLIAM GALLAGHER, Individually and as Civil Service Commissioner, RALPH MARINO, Individually and as Civil Service Commissioner, and DUNMORE POLICE ASSOCIATION, Defendants | : |

DEPOSITION OF TONY GARZELLA

Taken in the law offices of Marshall, Dennehey, Warner, Coleman and Goggin, 401 Adams Avenue, Scranton, Pennsylvania, on Tuesday, May 2, 2006, commencing at 9:30 a.m., by Wendy Engler Shade, RDR, CRR.

* * *

ERSA OF ALLENTOWN
Professional Court Reporters
Commerce Corporate Center Plaza III
5050 Tilghman Street, Suite 120
Allentown, PA  18104
610.366.7119

Page 10

1  A.     I think the active reserve might have come
2  later, maybe '98, but --
3  Q.     But that would have been after you started as a
4  part-timer?
5  A.     They changed names so many times.
6  Q.     At any point in time did you become an active
7  reserve police officer in Dunmore?
8  A.     Yes.
9  Q.     What year did that happen?
10 A.     Maybe '97, '98.
11 Q.     How were you notified that you were an active
12 reserve officer?
13 A.     Just through contract negotiations, they
14 changed our name, because they were working us 40 hours
15 a week, so --
16 Q.     Were you ever a member of the negotiating
17 committee for the FOP?
18 A.     Hum-um.
19 Q.     That's a no?
20 A.     No. Sorry.
21 Q.     That's all right. Now, prior to the
22 arbitration award in February of 2005, had you
23 participated in any of the negotiations, whether you
24 were a member of a committee or an informal part of an
25 informal group, did you participate in any of the

Page 11

1  negotiations with the borough for the new contract?
2  A.     Hum-um.
3         MS. POLLICK: Objection.
4  Q.     That's a no?
5  A.     Just the conversation that I had with
6  Councilman Hennigan.
7  Q.     And those conversations that you had, were they
8  as part of the official FOP negotiating group?
9  A.     No. It wasn't really a negotiation session.
10        MR. HOLROYD: Just a point, this isn't
11 an FOP lodge. It's DPA, Dunmore Police Association.
12 Q.     Do you understand when I was using the term FOP
13 that I was -- in reality should have been referring to
14 the DPA, did you understand that?
15 A.     Correct.
16 Q.     And would your answers change if we substituted
17 the term DPA for FOP?
18 A.     No.
19 Q.     When did you have conversations with Councilman
20 Hennigan?
21 A.     I wouldn't know exactly offhand. Maybe
22 sometime in May. I'm not sure.
23 Q.     So they would have been conversations that
24 occurred after the arbitration award. Is that correct?
25 A.     Correct.

Page 12

1  Q.     Now, for the arbitration hearing itself, did
2  you actually -- prior to the actual arbitration award,
3  did you participate in any of the arbitration hearings?
4  A.     No.
5  Q.     When was the first time that you had ever heard
6  or there was any discussion that you may have to take a
7  civil service exam?
8  A.     When the award came back.
9  Q.     Did you have any discussions with anyone either
10 in the DPA or in the borough with respect to any type
11 of civil service exam before the civil service
12 arbitrator award in February of 2005?
13 A.     I'm not sure if I quite understand what
14 you're --
15 Q.     That's fine. I'll rephrase the question.
16 Before the arbitrator's award, did you have any
17 conversations with anyone in the DPA about the need or
18 the possibility that all police officers in the borough
19 would have to take a civil service exam? Was that ever
20 discussed within the membership of the DPA before the
21 arbitrator's award?
22 A.     It was just noted that there was a good chance
23 that a test would occur.
24 Q.     And how did you find that out?
25 A.     Just by talking to union members.

Page 13

1  Q.     Do you remember what union members said that?
2  A.     I believe Billy Springer, Rich Barth.
3  Q.     Anyone else?
4  A.     Not that I can remember, no.
5  Q.     Did they explain to you why a test may have to
6  be administered?
7  A.     Just to -- because we had to be civil service
8  to become active in the pension plan.
9  Q.     Now, have you done any personal research to
10 determine whether or not that's true, that in order to
11 become a member of the pension plan you have to pass a
12 civil service test?
13 A.     Myself, no, I didn't research it.
14 Q.     How about Mr. Cali, has he done any research to
15 your knowledge?
16 A.     I don't know if he did or not.
17 Q.     Did you have any conversations with Mr. Cali
18 where you discussed whether it was necessary to pass a
19 civil service exam in order to receive a pension?
20 A.     Yeah. We talked about it.
21 Q.     Tell me about those conversations. What did
22 you talk about?
23 A.     Just like he didn't think it was right that we
24 would have to take a civil service test to get into a
25 pension after we've been there for so long, you know.

Page 14

1  Q.  Did he explain why he believed it wasn't right?
2  A.  No, not that I could recall, but he didn't want
3  to take a civil service test.
4  Q.  Now, you talked about Officer Springer and
5  Officer Barth. Did you have any discussions with any
6  borough official before the arbitrator's award about
7  the possibility that you would have to take a civil
8  service exam in order to receive a pension?
9  A.  Just the conversation with Councilman Hennigan.
10 Q.  My question is specific in time. It's before
11 the actual arbitrator's award. You had said that the
12 conversation you had with Councilman Hennigan --
13 A.  No, not before.
14 Q.  Let me just ask the question again so it's
15 clear. Did you have any conversations with any
16 Councilperson or the borough manager or any member of
17 the Civil Service Commission or any other borough
18 official or employee other than a police officer about
19 the possibility that you would have to pass a civil
20 service test in order to receive a pension?
21     MS. POLLICK: Objection. Compound
22 question.
23 A.  Not that I recall, no.
24 Q.  How did you find out about the arbitrator
25 award?

Page 15

1  A.  I think it was e-mailed to me.
2  Q.  By whom?
3  A.  By Councilman Springer, I think.
4  Q.  What did you do when you received the e-mail?
5  A.  Just read it.
6  Q.  Did you have any opinion or feeling about
7  having to take a civil service exam before the
8  arbitrator award?
9  A.  Yeah, nervous.
10 Q.  Now, you said that Officer Cali was -- he had
11 voiced some concern about the need to take a civil
12 service exam, correct?
13 A.  What do you mean, that he wanted to take a
14 test?
15 Q.  No. You testified earlier that Officer Cali
16 had said to you that he didn't think you needed to take
17 a civil service exam in order to receive a pension,
18 correct?
19 A.  Correct.
20 Q.  Did he voice any opinion about whether or not
21 he wanted to take a civil service exam?
22 A.  He didn't want to take one, no.
23 Q.  Why not? Did he explain that to you?
24 A.  No. He just didn't want to take one. He felt
25 that if we had to take it after --

Page 16

1  Q.  The conversation you had with Councilman
2  Hennigan in May of 2005, where did that take place?
3  A.  At his house.
4  Q.  Who was there?
5  A.  Myself and Anthony Cali.
6  Q.  Why did you go to his house?
7  A.  Anthony called me up and said that he had some
8  kind of conversation with -- he was friends with
9  Hennigan's wife and I guess they had some kind of
10 disagreement, which I'm not really familiar with. Well
11 anyway, I guess Councilman Hennigan wanted to talk to
12 Anthony Cali and he said come over to my house.
13     In the meantime, he was going over
14 there, I wasn't involved in going over there. Billy
15 Bonavoglia was going with him and I didn't know
16 anything about it. In the meantime Billy Bonavoglia
17 couldn't go. Anthony called me up. He said will you
18 come with me, he said, and see what he has to say, so
19 they wouldn't think that I was trying to negotiate a
20 contract or do anything behind the union's back.
21 Q.  That's what Officer Cali told you?
22 A.  Yeah.
23 Q.  He didn't want the union to think that he was
24 trying to negotiate behind their back?
25 A.  Negotiate a contract behind their back.

Page 17

1  Q.  Did he say anything else to you during that
2  conversation?
3  A.  Hum-um.
4  Q.  No?
5  A.  No.
6  Q.  You have to say yes or no.
7  A.  Sorry.
8  Q.  After that conversation, what happened?
9  A.  We went to Hennigan's house.
10 Q.  Now, when you went to Hennigan's house, had the
11 civil service exam been scheduled already?
12 A.  I believe it was, yes.
13 Q.  Had you taken it yet?
14 A.  No.
15 Q.  Who was present for that meeting?
16 A.  The three of us.
17 Q.  Was Mr. Hennigan's wife there?
18 A.  She was there but she had left.
19 Q.  What time of day was this meeting?
20 A.  Afternoon, 2, 3.
21 Q.  Did you notify any member of the DPA that you
22 were going to Mr. Hennigan's house?
23 A.  I didn't, no.
24 Q.  Do you know whether Officer Cali notified
25 anybody at the DPA?

Page 18

1  A.  I don't know, no.
2  Q.  Did you ask him whether or not he notified
3  anybody at the DPA?
4  A.  I told him that he should tell them, you know,
5  that we're going there. I don't know if he ever did or
6  not.
7  Q.  Why did you tell him that?
8  A.  Just because I know there was still
9  negotiations going on where the contract could have
10 been settled or not, we didn't know.
11 Q.  And why is that significant?
12      MS. POLLICK: Objection.
13 Mischaracterization of prior testimony.
14 A.  Excuse me?
15 Q.  There were negotiations going on at the time?
16 A.  I believe right down to the last minute before
17 the arbitration came back.
18 Q.  And you felt that the DPA should be aware of
19 the fact that there were two police officers who were
20 talking to a Borough Council member during the
21 negotiating process, correct?
22      MS. POLLICK: Objection.
23 Mischaracterization of prior testimony. Assumes facts
24 not into evidence.
25 Q.  Correct?

Page 19

1  A.  Right.
2  Q.  Now, when you went to the house, tell me what
3  happened.
4  A.  They just spoke back and forth. He wanted to
5  know -- like Anthony asked Councilman Hennigan like how
6  the situation transpired, where we were, we went to
7  arbitration and how the whole test came about and that
8  we thought it could have been settled and it wasn't
9  settled.
10      And Councilman Hennigan said there's
11 facts on both sides that are at fault and basically
12 that's it. Councilman Hennigan was worried because he
13 said that we can't hire everybody, but to pay all the
14 money up front, that it would be too much at one time.
15 And I mean it was basically just between them two.
16 Q.  Were part of the issues, and correct me if I'm
17 wrong, part of the issues that were being negotiated
18 between the DPA and the borough was whether or not the
19 reserve officers could become full-time police officers
20 and receive the same pay and benefits as full-time
21 police officers?
22      MS. POLLICK: Objection. Assumes facts
23 not into evidence and vague. No time.
24 Q.  Go ahead. You can answer it.
25 A.  Correct.

Page 20

1  Q.  So when you're talking about what Mr. Hennigan
2  is referring to the fact that people wanted to be paid
3  quickly or immediately, are you talking about bringing
4  the reserve officers' pay up to the pay or equal pay of
5  the full-time officers?
6  A.  Through a scale. Not all at one time.
7  Q.  And you were aware before this meeting with Mr.
8  Hennigan that that was one of the sticking points of
9  the negotiations, did you not?
10      MS. POLLICK: Objection. Assumes facts
11 not into evidence.
12 A.  Correct.
13 Q.  Now, the other issue of course that was a
14 sticking point in the negotiations was how could
15 reserve officers get into the pension system, correct?
16      MS. POLLICK: Objection. Assumes facts
17 not into evidence.
18 A.  One more time, please.
19 Q.  One of the other sticking points that you were
20 aware of during the negotiating process was how the
21 reserve officers could become eligible to receive a
22 pension?
23      MS. POLLICK: Same objection.
24 A.  Correct.
25 Q.  What if anything did Officer Cali say to Mr.

Page 21

1  Hennigan?
2  A.  He just said if something could be worked out,
3  you know, where it wouldn't cost a fortune for the
4  borough all at one time, if it could have been
5  structured, if the contract could be stretched out say
6  at least two more years, and he just said bring it back
7  to your union to see what they would go for.
8  Q.  How did you feel about that meeting? Did you
9  feel comfortable that Officer Cali, who was not a part
10 of the negotiating committee of the DPA, was
11 discussing --
12 A.  He was part -- he was part of the negotiating
13 committee.
14 Q.  He was, I'm sorry. Who was on the negotiating
15 committee for the DPA at that time?
16 A.  I believe Billy Springer, Rich Barth, Billy
17 Bonavoglia and Anthony Cali.
18 Q.  To your knowledge, did any member of that
19 committee conduct negotiations without any other member
20 of the committee present?
21      MS. POLLICK: Objection. Lack of
22 personal knowledge. Assumes facts not into evidence.
23 A.  Not that I know of.
24 Q.  Did you take any notes from that meeting?
25 A.  Hum-um.

Page 22

1 Q. That's a no?
2 A. No.
3 Q. Did Officer Cali take any notes?
4 A. I don't think so, no.
5 Q. Do you know whether Mr. Hennigan took any
6 notes?
7 A. No.
8 Q. How long did the meeting last?
9 A. About an hour.
10 Q. What else was discussed during that meeting, if
11 anything?
12 A. I told him that I didn't think it was fair that
13 we were here for so long and we would have to take a
14 civil service test after working almost ten years
15 full-time when there was other people in the borough
16 that enjoyed a pension, full-time salary, I mean, and
17 they're not civil servants. They never took a test.
18 Then we have some guys that actually just paid a dollar
19 to become civil service.
20 Q. What else did you say?
21 A. That's just -- I didn't say too much there.
22 Q. When you said that, did Mr. Hennigan respond in
23 any way?
24 A. I can't remember exactly what his response was.
25 Q. How did the meeting end?

Page 23

1 A. Just between Anthony and Thomas Hennigan, they
2 just -- he just asked him to bring back to the union to
3 see if something could be worked out where we can
4 stretch the time frame of the contract, instead of like
5 I think it was a four or five year contract, to stretch
6 it out to six or seven years so the borough wouldn't
7 have the burden of paying everything to the guys.
8 Q. Was Officer Cali, was he receptive to that
9 proposal?
10 A. Um-hum.
11 Q. Is that a yes?
12 A. Yes. Sorry.
13 Q. How about you? What did you think of that
14 proposal?
15 A. I wasn't really too sure. I didn't think
16 anything of it really. I mean after I left there, that
17 was the end of it.
18 Q. Did Mr. Hennigan threaten you during that
19 meeting?
20 A. No.
21 Q. Did he threaten Officer Cali during that
22 meeting?
23 A. No.
24 Q. Prior to that meeting, did you ever have any
25 occasion to talk to Mr. Hennigan, you know,

Page 24

1 unofficially, see him around town?
2 A. No. That was the first time I met him.
3 Q. How about Officer Cali, did you ever know
4 whether he had any contacts with Mr. Hennigan before
5 that?
6     MS. POLLICK: Objection. Lack of
7 personal knowledge.
8 A. I don't know.
9 Q. How did Officer Cali know Mr. Hennigan's wife?
10 A. I believe she ran like a vacation company. If
11 that's the next -- I mean I don't know if that's the
12 only, but I know she books like vacations for people.
13 Q. Had you had any conversations with her before
14 that day?
15 A. No. I don't know.
16 Q. Now, you said she left. Did she leave before
17 the meeting started or she left at some point while the
18 meeting was ongoing?
19 A. Before.
20 Q. When the meeting was over, what did you and Mr.
21 Cali do?
22 A. I went home.
23 Q. What did Officer Cali do?
24 A. I don't know.
25 Q. Did you or he speak after the meeting? In

Page 25

1 other words, as you're walking to your cars or
2 whatever, did you have any discussion about hey, how
3 did that go or anything like that?
4 A. I told him, I said if something's going to
5 happen, you got to notify the union and let them know
6 what's going on.
7 Q. What did you do to study for the civil service
8 exam?
9 A. Study guide that the borough gave us. I bought
10 one of them civil service books just to practice up.
11 Q. Anything else?
12 A. No.
13 Q. When did you purchase the book?
14 A. Maybe about a month after we found out we would
15 have to take a test, if not sooner. I don't remember.
16 Q. So would it have been sometime in February or
17 March of 2005?
18 A. Correct.
19 Q. And the study guide, when did you start using
20 that?
21 A. As soon as we received it.
22 Q. When was that?
23 A. I think it was like six days before the test.
24 Q. Did you do anything else other than use the --
25 strike that.

### Page 30

1 to you the type of test he took, correct?
2 A. Correct.
3 Q. He told you that it was timed and it had
4 certain sections?
5 A. Right.
6 Q. Based on what Danny told you, obviously you
7 didn't sit with Danny to take the test, but based on
8 what Danny told you, was the test that you took similar
9 to the test that Danny described to you?
10 A. Yes.
11 Q. Other than talking to Danny Jones, did you talk
12 to any other officers who had taken a civil service
13 exam before you took the one in Dunmore?
14 A. Not that I can recall.
15 Q. Did Danny give you any tips on how to prepare?
16 A. No, not really.
17 Q. The exam itself, when did that take place?
18 A. Which one now?
19 Q. The one you had to take, the civil service
20 exam.
21 A. I believe it was the 21st of May.
22 Q. Where did it take place?
23 A. At Dunmore High School.
24 Q. Who took the test that day?
25 A. All the active reserve officers.

### Page 31

1 Q. And did all the active reserve officers show up
2 for the test?
3 A. I believe so, yes.
4 Q. Other than the one conversation with Councilman
5 Hennigan, did you have any other conversations with any
6 other Borough Council members before you took the civil
7 service exam?
8 A. Not that I recall.
9 Q. Did you ever talk to Mr. Loftus, the borough
10 manager, before you took the civil service exam?
11 A. About --
12 Q. About the test.
13 A. I might have briefly.
14 Q. Do you remember what that conversation was
15 about?
16 A. Just I think it was when the contract came back
17 or something or there might have been a test involved
18 with it or something.
19 Q. What does that mean, when the contract came
20 back?
21 A. When the contract came back that he thinks that
22 we would have to take a civil service test to get our
23 jobs, our full-time jobs.
24 Q. You mean when the arbitration award came out?
25 A. Yeah.

### Page 32

1 Q. So when you had this conversation it would have
2 been closer in time to the February 2005 arbitrator's
3 award?
4 A. I don't remember exactly.
5 Q. Did Mr. Loftus threaten you during that
6 conversation?
7 A. No.
8 Q. Before you took the civil service test, did Mr.
9 Loftus ever threaten you?
10 A. No.
11 Q. The members of the Civil Service Commission,
12 did you know who they were before the exam was
13 administered?
14 A. Yes. I don't know. I only know one person on
15 the board.
16 Q. Who is that?
17 A. Mr. Barrett.
18 Q. How do you know him?
19 A. He was my school teacher.
20 Q. Did you ever have any -- did you ever have any
21 conversations with Mr. Barrett about the civil service
22 exam?
23 A. No.
24 Q. And you never -- you don't know who the other
25 two members are. Is that correct?

### Page 33

1 A. I may know Gallagher if I see him, but I'm not
2 -- Marino, I don't know.
3 Q. Did you ever have any conversations with Mr.
4 Gallagher about the civil service test?
5 A. No.
6 Q. Did you ever have any conversations with Mr.
7 Marino about the civil service test?
8 A. Hum-um.
9 Q. That's a no?
10 A. No.
11 Q. The Civil Service Commission solicitor, Frank
12 O'Neill, do you know him?
13 A. No.
14 Q. Ever have any conversations with him before the
15 civil service test?
16 A. Not that I'm aware of, no.
17 Q. Councilman Joseph Talutto, did you ever have
18 any conversations with him about the civil service
19 test?
20 A. Before or after?
21 Q. Before.
22 A. No.
23 Q. Leonard Verrastro, V-E-R-R-A-S-T-R-O, did you
24 ever have any conversation with Councilman Verrastro
25 before the civil service test?

**Page 42**

1  to make anybody really fail. And he said but, however,
2  if you get more than I think it was 22 or 23 answers
3  wrong, he said, you will fail the test. And that's it.
4  We just took it from there.
5  Q.    Did they hand anything out to you other than
6  the test?
7  A.    Yes. A piece of paper.
8  Q.    What was on the piece of paper?
9  A.    Just 70 percent was passing for the written
10 section, I think, and 30 percent was for the oral
11 interviews. It was like a basic piece of paper.
12 Q.    Did that piece of paper say anything else, to
13 your knowledge?
14 A.    It did, but I can't recall exactly what it
15 said.
16 Q.    Was there anything on that piece of paper that
17 explained that you had to get a 70 percent in each of
18 the sections?
19 A.    No.
20 Q.    The test itself, were there any instructions on
21 the test about what a passing grade would be?
22 A.    No.
23 Q.    How long did you have to take the test?
24 A.    I think it was a 75 minute test, but I'm not
25 sure.

**Page 43**

1  Q.    Was there any more discussion before the test
2  was taken other than what you've already testified to,
3  either from the chief of Bloomsburg or from Mr.
4  O'Neill?
5  A.    No.
6  Q.    Did Mr. O'Neill stay in the room for the
7  duration of the test?
8  A.    I believe he did. I'm not sure though. He sat
9  behind me.
10 Q.    Say that again.
11 A.    He sat behind me, so --
12 Q.    How about the chief from Bloomsburg, was he
13 there for the duration of the test?
14 A.    Yes, he was.
15 Q.    When the test was finished, what happened?
16 A.    They just collected them.
17 Q.    Other than failing the test, do you believe
18 there's anything else that the borough did to retaliate
19 against you for complaining about having to take the
20 test?
21 A.    I didn't fail the test.
22 Q.    Anything else that anybody from the borough did
23 to retaliate against you other than what you've already
24 testified?
25 A.    No.

**Page 44**

1  Q.    The other members of the police department who
2  complained about the test, were they retaliated
3  against?
4  A.    No.
5  Q.    Do you know why?
6  A.    What do you mean now?
7  Q.    Well, you said that you weren't the only one
8  that complained that the test was unfair, correct?
9  A.    Well, mostly all the guys complained.
10 Q.    Right. But only three failed the test, right?
11        MS. POLLICK: Objection.
12 Mischaracterization of testimony. Assumes facts not
13 into evidence.
14 A.    We didn't fail.
15 Q.    According to the borough only three failed the
16 test.
17 A.    According to the borough.
18 Q.    Correct?
19 A.    Correct.
20 Q.    But everybody complained that it was unfair?
21        MS. POLLICK: Objection. Lack of
22 personal knowledge.
23 A.    Basically everybody that I know.
24 Q.    So my question is how come the borough didn't
25 fail everybody else but only failed you three?

**Page 45**

1  A.    I don't know.
2  Q.    Following the test, when did you get your
3  results?
4  A.    I know it was -- I think it was like ten days
5  after everybody else was notified. They had an old
6  address. They mailed it to an old address.
7  Q.    You have no reason to believe that that was
8  done intentionally so that you wouldn't get your score,
9  do you?
10 A.    No.
11 Q.    You got your score in the mail?
12 A.    Correct.
13 Q.    Was that a letter that you received from Mr.
14 O'Neill?
15 A.    Um-hum.
16 Q.    That's a yes?
17 A.    Correct.
18 Q.    What did you do when you got the letter?
19 A.    Read it, couldn't believe it.
20 Q.    What did you do then after that?
21 A.    I was just in shock that they did stuff like
22 that.
23 Q.    Did you call anybody in the DPA?
24 A.    I might have and I'm not sure if I did or not.
25 I can't say for sure.

|  | 62 |
|---|---|
| 1 | borough manager, about the test? |
| 2 A. | No. |
| 3 Q. | Do you know whether Officer Cali spoke to any |
| 4 | Borough Council members after the test? |
| 5 | MS. POLLICK: Objection. Lack of |
| 6 | personal knowledge. |
| 7 A. | I don't know. |
| 8 Q. | Do you know whether Officer Cali spoke to Mr. |
| 9 | Loftus after the test? |
| 10 A. | I don't know. |
| 11 | MS. POLLICK: Objection. Lack of |
| 12 | personal knowledge. |
| 13 Q. | Do you know whether Officer Cali spoke to any |
| 14 | member on the Civil Service Commission after the test? |
| 15 | MS. POLLICK: Same objection. |
| 16 A. | I don't know exactly who he talked to. |
| 17 Q. | Before you took the civil service test, what |
| 18 | rank did you hold with the police department? |
| 19 A. | Patrolman. |
| 20 Q. | And within the DPA, under the collective |
| 21 | bargaining agreement, what was your position? |
| 22 A. | Patrolman. |
| 23 Q. | Were you a full-time officer or reserve |
| 24 | officer? |
| 25 A. | I was full-time, but they called us reserve |

|  | 63 |
|---|---|
| 1 | officers. |
| 2 Q. | So before you took the test you held the rank |
| 3 | of patrolman, correct? |
| 4 A. | Correct. |
| 5 Q. | And you were an active reserve officer, |
| 6 | correct? |
| 7 A. | Correct. |
| 8 Q. | After you took the test, what rank did you |
| 9 | hold? |
| 10 A. | Patrolman. |
| 11 Q. | And were you an active reserve officer after |
| 12 | you took the test? |
| 13 A. | Yes. |
| 14 Q. | Now, are you currently on any type of |
| 15 | disability, heart and lung compensation? |
| 16 A. | Yeah. |
| 17 Q. | What are you on now? |
| 18 A. | Heart and lung. |
| 19 Q. | When did that start? |
| 20 A. | The 17th of November. |
| 21 Q. | Of '05? |
| 22 A. | Yes. |
| 23 Q. | So when you took the test, you were on patrol, |
| 24 | you were -- |
| 25 A. | Correct. |

|  | 64 |
|---|---|
| 1 Q. | -- working a schedule? |
| 2 A. | Yes. |
| 3 Q. | After the test, the hours that you worked, were |
| 4 | they altered in any way? |
| 5 A. | Not right after the test. Maybe a month, six |
| 6 | weeks after. |
| 7 Q. | And how were your hours altered? |
| 8 A. | I was put on midnights. |
| 9 Q. | How are shifts -- how are people assigned to a |
| 10 | shift? |
| 11 A. | We bid by seniority. |
| 12 Q. | And how was it that you went to midnights? |
| 13 A. | Because I lost my seniority. |
| 14 Q. | Under the collective bargaining agreement, it's |
| 15 | my understanding that full-time officers have seniority |
| 16 | over active reserve officers. Is that correct? |
| 17 A. | Correct. |
| 18 Q. | And then within the classification of active |
| 19 | reserve officers, you can have seniority over other |
| 20 | active reserve officers. Is that correct? |
| 21 A. | Correct. |
| 22 Q. | So as a result of remaining as an active |
| 23 | reserve officer and the other officers passing the test |
| 24 | and being promoted to full-time officer, the seniority, |
| 25 | they had higher seniority than you, correct? |

|  | 65 |
|---|---|
| 1 A. | Um-hum. |
| 2 Q. | That's a yes? |
| 3 A. | Correct. |
| 4 Q. | Other than having your shift change, did your |
| 5 | hours decrease, increase or did they stay the same? |
| 6 A. | Stayed the same. |
| 7 Q. | Do you have rotating shifts? |
| 8 A. | No. We bid shifts Monday day, like day shift 3 |
| 9 | to 11 and midnights are steady. They're steady shifts. |
| 10 Q. | When you bid for a shift, how long is that bid |
| 11 | good for? |
| 12 A. | One year. |
| 13 Q. | So you're working the midnights -- so you would |
| 14 | work the midnight shift for that entire year, correct? |
| 15 A. | For one year, yes. |
| 16 Q. | [redacted] |
| 17 A. | [redacted] |
| 18 | [redacted] |
| 19 | [redacted] |
| 20 | [redacted] |
| 21 | [redacted] |
| 22 | [redacted] |
| 23 | [redacted] |
| 24 | [redacted] |
| 25 Q. | [redacted] |

**Page 66**

1 [redacted]
2 A. [redacted]
3 Q. [redacted]
4 A. [redacted]
5 Q. [redacted]
6 [redacted]
7 A. [redacted]
8 Q. And when you resume active duty, you'll go back
9 to the midnight shift. Is that the way it works?
10 A. I believe I'm on day shift now.
11 Q. You can't ask him. That's your understanding,
12 is that you've been switched to day shift?
13 A. Yeah.
14 Q. Did you file any grievance about the scoring
15 with the borough?
16 A. Not with the borough, with the union.
17 Q. Did you file any type of official complaint,
18 grievance, appeal, however you want to term it, with
19 the borough about the way the scoring was done?
20 A. No.
21     MS. POLLICK: Objection. Assumes facts
22 not into evidence.
23 Q. Now, you said you filed a grievance with the
24 union. When did that take place?
25 A. I think it was June.

**Page 67**

1 Q. June of '05?
2 A. Yes.
3 Q. Shortly after the test results came out?
4 A. Yes.
5 Q. How did you file the grievance? What did you
6 physically have to do?
7 A. Anthony Cali wrote the grievance up and we
8 just, Patrolman Sibio and I read it and we just -- he
9 filed it and I think the president of the union.
10 Q. Do you know what happened to the grievance?
11 A. No.
12 Q. Did you ever follow up with the president of
13 the union to find out what happened?
14 A. Yeah. I asked him what was going on with it.
15 Q. When?
16 A. I couldn't tell you right offhand exactly when.
17 Q. Was it within a couple of months?
18 A. Yeah, maybe a couple months, a month.
19 Q. Who did you talk to?
20 A. Rich Barth.
21 Q. What did he tell you?
22 A. He said he didn't know, that I guess they were
23 in the process of talking to Attorney Jennings and
24 trying to get something figured out.
25 Q. Did you follow up with Barth after that to find

**Page 68**

1 out what happened with the grievance?
2 A. I just kept asking him exactly what was going
3 on with it.
4 Q. And what's your understanding of what happened
5 to the grievance?
6 A. I don't think anything happened with the
7 grievance.
8 Q. When was the last time you spoke to any
9 leadership in the union about your grievance?
10 A. This --
11 Q. The grievance about the test.
12 A. In June. Not in awhile.
13 Q. Is there another grievance?
14 A. There was another grievance filed.
15 Q. By who?
16 A. By myself and Anthony.
17 Q. When did you file that one?
18 A. When we had our seniority taken off us.
19 Q. And who did you file that grievance with?
20 A. With the union.
21 Q. Do you know what happened to that grievance?
22 A. The last time we had a grievance committee and
23 it was denied after a couple weeks after we sat for the
24 grievance committee.
25 Q. When were you notified that it was denied? Do

**Page 69**

1 you remember what month?
2 A. No, not really. It might have been a month
3 after the meeting, but I'm not quite sure.
4 Q. While you worked for the borough of Dunmore,
5 did you ever work for any other police department?
6 A. No.
7 Q. Did you ever look for a job at any other police
8 department?
9 A. No.
10 Q. Did you look for a job at another police
11 department before you started at Dunmore?
12 A. No.
13 Q. Where did you grow up?
14 A. Dunmore.
15 Q. During the tenure of your employment with the
16 borough, have you ever been disciplined for any reason?
17 A. With the borough?
18 Q. With the borough.
19 A. No.
20 Q. During your tenure with the borough, have you
21 always remained certified as a police officer?
22 A. Yes.
23 Q. Have you ever been arrested?
24 A. No.
25 Q. Did you work anywhere else after you graduated

Page 78

1 Q. Good morning, officer. I don't know if we ever
2 met before, but my name is Steve Holroyd. I represent
3 Dunmore Police Association in this matter. And I have
4 a few questions for you. I don't expect to take as
5 long as Mr. Gonzales did.
6   I would ask that the same instructions
7 he gave you, that you just keep them in mind when I'm
8 asking you questions.
9   For starters, you are employed by the
10 borough of Dunmore Police Department?
11 A. Correct.
12 Q. You're not employed by the Dunmore Police
13 Association?
14 A. Correct.
15 Q. The Dunmore Police Association, that's your
16 union?
17 A. Correct.
18 Q. How long have you been in the union?
19 A. I would say it has to be at least ten years
20 now. I don't know exactly. I think it was 1996 we got
21 put in the union. I'm not sure.
22 Q. Have you ever held union office?
23 A. No.
24 Q. Have you ever run for union office?
25 A. No.

Page 79

1 Q. Did you ever campaign for or against anyone in
2 a union election?
3 A. Not openly, no.
4 Q. Other than the grievance regarding the test and
5 I think the grievance you told us about your seniority,
6 have you ever filed any other grievances with the
7 union?
8 A. Just one grievance that there wasn't enough
9 information on it and they sent it back and they said I
10 had to do it over.
11 Q. And what grievance was that?
12 A. I had to put more information on it. It was
13 the one about seniority.
14 Q. When was that filed with the union?
15 A. I believe it was August, I'm not sure though.
16 Q. 2005?
17 A. Yeah.
18 Q. And the union's response was they needed more
19 information?
20 A. To make it more factual, I believe they used
21 the term.
22 Q. Did you do that?
23 A. Yes.
24 Q. And did you refile the grievance?
25 A. Yes.

Page 80

1 Q. Any other grievances?
2 A. Just that's it. No.
3 Q. Now, the arbitration award came out in February
4 of 2005, correct?
5 A. Correct.
6 Q. Prior to that award coming out, do you recall
7 whether there were union meetings discussing the
8 possibility of settling the contract prior to the award
9 coming out?
10 A. Yes, there was.
11 Q. Did you attend those meetings?
12 A. Yes.
13 Q. Approximately how many meetings were there?
14 A. I couldn't say offhand.
15 Q. At those meetings, was the possibility of a
16 civil service test addressed?
17 A. Yeah. They said if we went to arbitration
18 there would be a good chance that we'd possibly be
19 taking a civil service test.
20 Q. During those meetings, was any union member in
21 particular advocating settling the contract prior to an
22 award coming out?
23   MS. POLLICK: Objection. Calls for
24 speculation.
25 A. Patrolman Springer was vocal on settling it.

Page 81

1 Q. When Patrolman Springer was being vocal about
2 settling, did he address the test at all?
3 A. That there would be a possibility if we went to
4 arbitration that they would give us a test.
5 Q. Was Patrolman Springer concerned about the
6 test?
7 A. Yes, I believe he was.
8 Q. Did he indicate whether or not he wanted to
9 take a test?
10 A. I don't remember, but I don't think he would
11 take the test -- I think he might have said he didn't
12 want to take a test.
13 Q. Now, while Patrolman Springer was talking about
14 the possibility of settling, were there any police
15 officers who were adamant against settling and wanting
16 to get an award?
17 A. The majority of them were.
18 Q. And was Officer Cali in that majority?
19 A. Yes.
20 Q. Now, after the decision came out, how long
21 after the decision came out was the test scheduled?
22 A. The award came back I guess sometime in
23 February and I think the test was scheduled for the
24 22nd of May.
25 Q. And I guess the better question would have been

Page 82

1  when were police officers advised that the test was
2  scheduled for May?
3  A.    Maybe six weeks after the award came back. I'm
4  not sure exactly.
5  Q.    After the award came out, was there a union
6  meeting to discuss whether to appeal the award?
7  A.    I believe there was, yes.
8  Q.    Did you attend that meeting?
9  A.    I think I did, yes.
10 Q.    And at that meeting, did the union membership
11 vote not to appeal the award?
12 A.    Correct.
13 Q.    Do you recall what the vote was?
14 A.    No.
15 Q.    After the test was scheduled, did some officers
16 continue to express concerns about their ability to
17 take the test?
18 A.    Yes.
19 Q.    Which officers had expressed concerns about
20 their ability to take the test?
21 A.    Quite a few of them expressed themselves.
22 Q.    Can you remember who?
23 A.    Myself, Anthony, I know Rich Barth was
24 concerned, you know. The majority of the guys were
25 concerned.

Page 83

1  Q.    Was there an Officer Reynolds?
2  A.    Reynolds.
3  Q.    Now, did any officers offer to tutor other
4  officers in preparing for this test?
5  A.    Yes.
6  Q.    And which officers offered to do that?
7  A.    Officer Springer.
8  Q.    And at this time was there something called a
9  police update class going on?
10 A.    Yes.
11 Q.    And what is that exactly?
12 A.    You go for your updates, your mandatory updates
13 that are required by the state.
14 Q.    And at the time were you participating in the
15 updates?
16 A.    Yes.
17 Q.    Was Patrolman Springer offering to prep people
18 after these updates were done?
19 A.    Um-hum.
20 Q.    And did he prep Officer Reynolds?
21 A.    Yes.
22 Q.    And did he prep you?
23 A.    Yes.
24 Q.    How many times did he prep with you?
25 A.    I did it once, that one time.

Page 84

1  Q.    Now, did he offer to continue to prep you?
2  A.    Yes.
3  Q.    But you didn't take him up on that offer?
4  A.    We just never could get together.
5  Q.    Were also prep sessions being done through your
6  lunch break on your regular shifts, during police
7  officers' lunch breaks?
8         MS. POLLICK: Objection.
9  Q.    Let me rephrase that. Do you know whether
10 there were also prep sessions being done during the
11 lunch shifts, lunch breaks?
12        MS. POLLICK: Objection. Calls for
13 speculation.
14 A.    I don't know.
15 Q.    In your complaint, officer, you make a number
16 of allegations that I wanted to explore with you. At
17 paragraph 18 --
18        MS. POLLICK: I'm just going to object
19 to the fact that you're not giving him a copy of the
20 complaint and you're referring to a paragraph.
21        MR. HOLROYD: Let's go off the record.
22        (Discussion off the record.)
23 BY MR. HOLROYD:
24 Q.    Officer, you've been handed what's been marked
25 as Garzella Exhibit 3. Let me direct your attention to

Page 85

1  page 5 of that complaint. Let me direct your attention
2  to paragraph 18. There you allege defendants in
3  recognition of your years of service failed to promote
4  slash in effect demoted you in or around June 2005.
5  Which defendants were you referring to?
6  A.    I believe the borough.
7  Q.    The borough. It's not your contention that the
8  Dunmore Police Association failed to promote you or in
9  effect demoted you?
10 A.    Right.
11 Q.    Similarly, at paragraph 19, where you allege
12 you received a passing score but defendants had failed
13 to promote you, which defendants are you referring to
14 there?
15 A.    The borough.
16 Q.    You're not alleging that the Dunmore Police
17 Association failed to promote you?
18 A.    Correct.
19 Q.    Similarly at paragraph 20, where again you
20 allege defendants demoted you, that's referring to the
21 borough?
22 A.    Correct.
23 Q.    You're not referring to the DPA's having
24 demoted you. Is that correct?
25 A.    Correct.

86

1  Q. Paragraph 22 where you allege defendants never
2  gave Officer Garzella oral or written notice of the
3  charges against him or opportunity to respond to the
4  charges, you're referring to the borough?
5  A. Correct.
6  Q. You're not alleging that the Dunmore Police
7  Association never gave you written notice of charges
8  against you?
9  A. Correct.
10 Q. Paragraph 23, which is the next page, you
11 allege defendants never provided Officer Garzella with
12 a pre-failure to promote/demotion hearing or any
13 post-failure to promote/demotion hearing as required by
14 law. Again, the defendants you're referring to there
15 is the borough?
16 A. Correct.
17 Q. You're not alleging that the Dunmore Police
18 Association failed to provide you with any hearing?
19        MS. POLLICK: Objection. Assumes facts
20 not into evidence.
21 A. Correct.
22 Q. And finally, at paragraph 24, where you allege
23 defendants had intentionally failed to provide Officer
24 Garzella with any hearing on those charges, the
25 defendants you're referring to there is the borough of

87

1  Dunmore?
2  A. (Witness nods head)
3  Q. You're not alleging that the Dunmore Police
4  Association failed to provide you with any hearing or
5  notice of charges?
6        MS. POLLICK: Objection. Assumes facts
7  not in evidence.
8  A. No.
9  Q. No, it's not correct, or no, you're not
10 alleging the DPA has failed to provide you with a
11 hearing?
12 A. Not alleging.
13 Q. At paragraph 27, you allege that the defendant
14 Dunmore Police Association has discriminatorily,
15 arbitrarily and in bad faith refused to represent you
16 in connection with your grievances. What evidence do
17 you have to support that contention?
18 A. Just the grievance that we filed.
19 Q. And which grievance would that be?
20 A. The first one.
21 Q. That's the grievance involving the test?
22 A. Or the scoring.
23 Q. The scoring of the test?
24 A. Um-hum.
25 Q. This is a grievance that was filed in about

88

1  June of 2005?
2  A. I believe so, yes.
3  Q. Now, prior, if I understood you correctly,
4  Anthony Cali filed that grievance on your behalf and
5  his and Jody's behalf?
6  A. Correct.
7  Q. Prior to his filing that grievance was there a
8  union meeting where the issue of the scoring of the
9  test was discussed?
10 A. I believe there was, yes.
11 Q. And during that meeting was a vote taken
12 regarding whether or not to proceed with that
13 grievance?
14 A. Yes, there was.
15 Q. And the vote --
16 A. Go ahead.
17 Q. I'm sorry. And the vote was the membership
18 voted not to proceed with the grievance. Is that
19 correct?
20 A. Correct.
21 Q. And the vote was 18 to 3?
22 A. Correct.
23 Q. And the three votes to proceed with the
24 grievance were your vote, Officer Cali's vote and
25 Officer Sibio's vote?

89

1  A. Correct.
2  Q. But after that meeting Officer Cali filed his
3  grievance anyway?
4  A. He filed it over the scoring of the test.
5  Q. But was that the same issue that was decided by
6  the membership prior to his filing the grievance?
7  A. No. The first grievance was over the whole
8  test itself.
9  Q. So the second grievance was over the scoring of
10 the test?
11       MS. POLLICK: Objection. Assumes facts
12 not into evidence and confusing.
13 A. Correct.
14 Q. So what was discriminatory, arbitrary or in bad
15 faith involving as far as the DPA's processing of that
16 grievance?
17       MS. POLLICK: Objection. Vague
18 question.
19 A. Which one now?
20 Q. The grievance about the scoring of the test.
21 A. Because they didn't do anything with us. It's
22 so obvious what occurred.
23 Q. Did anyone from the union ever advise you why
24 they were not proceeding with that grievance?
25 A. Yes.

Page 90

1  Q.    Who?
2  A.    We had a phone conversation with Tom Jennings.
3  Q.    Who was present on that phone conversation?
4  A.    Billy Springer, myself, Anthony Cali and that's
5  it, I think, just the four of us.
6  Q.    What was discussed during that call?
7  A.    I don't know if the grievance was -- that
8  grievance was discussed, but Attorney Jennings told us,
9  he said that we didn't pass the elements and we failed
10 the test. Basically just we failed the test and there
11 was nothing that he can do. And that the best thing
12 that we could do is probably just negotiate a test for
13 ourselves to take.
14 Q.    A second test?
15       MS. POLLICK: Objection. Assumes facts
16 not into evidence.
17 A.    To take a second test.
18 Q.    Any other conversations with union officials
19 regarding that grievance?
20 A.    None that I know of, no.
21 Q.    Did anyone from the union ever tell you that
22 they were refusing to process this grievance because of
23 anything you had done?
24 A.    No, nobody told me.
25 Q.    Do you have any other evidence to support your

Page 91

1  contention that the failure to process this grievance
2  was discriminatory, arbitrary or in bad faith?
3        MS. POLLICK: Objection. Calls for a
4  legal conclusion.
5  A.    No, not here with me now.
6  Q.    At paragraph 28 you allege that the DPA allowed
7  you to be harassed, publicly humiliated and demoted.
8  What evidence do you have to support that allegation?
9  A.    They're the ones that demoted me. I mean they
10 took my seniority off me originally.
11 Q.    The DPA?
12 A.    Yes.
13 Q.    I'm sorry. The DPA took your seniority off
14 you?
15 A.    Yes.
16 Q.    And how did they do that?
17 A.    They wrote a letter saying that we're going to
18 lose our seniority and they said they made up the new
19 seniority list and they sent it over to the borough,
20 that it was going to be done. I guess they gave them a
21 certain amount of time to contest it and it wasn't
22 contested and I lost my seniority.
23 Q.    This was the seniority list that was prepared
24 after the test results had come in?
25 A.    Right.

Page 92

1  Q.    And so this was the seniority list that had
2  full-time police officers ranked ahead of reserve
3  police officers?
4  A.    Correct.
5  Q.    Do you have any other evidence supporting the
6  allegation that the DPA harassed and publicly
7  humiliated you?
8  A.    Yeah, because just out in public, I mean people
9  would say to me, you know, you failed the test. And
10 the rumor going around was that I failed the test and I
11 actually passed the test. So it was kind of hard to --
12 I mean if they did what they were supposed to do and
13 they looked at all the facts, they'd see that I
14 actually passed the test.
15 Q.    When you say people, what people come up to
16 you?
17 A.    Just people in general, like.
18 Q.    Such as who, other police officers?
19 A.    No, like people if I walk into a store or
20 something, people in there, I had it at least two or
21 three times.
22 Q.    Can you recall those two or three times for me?
23 A.    Once at the smoke shop, the kid behind the
24 counter asked me if I -- something about a test, he
25 said you have to take a civil service test and you

Page 93

1  failed it and this and that, just going on and on. I
2  was like I didn't fail the test, you know. I passed
3  the test.
4  Q.    Do you remember the kid's name?
5  A.    I know his first name is -- I think it's Craig.
6  I wouldn't be able to tell you what his last name is.
7  Q.    And approximately when did that conversation
8  take place?
9  A.    This was a few months ago. This is back
10 towards probably December.
11 Q.    What other occasions can you recall?
12 A.    The owner of Sal's restaurant, Sal Ganari, had
13 mentioned it to me. He said that -- he said he was
14 happy that some guys failed the test that he didn't
15 like, but he said he felt bad for me because he said
16 that I failed the test. So I mean that was -- I had
17 explained to him that I didn't fail the test, I
18 actually passed the test.
19       And once at a party, I went to another
20 guy, same conversation over I think it was right around
21 the time when the lawsuit was filed. And he was
22 saying, you know, about me failing the test. And I
23 just felt like a jerk, you know what I mean, because I
24 actually didn't fail the test, I passed the test.
25 Q.    Who was it that third time, do you remember

TONY GARZELLA

Page 94

1  that person's name?
2  A.     His last name is Bistran and there's quite a
3  bit of family and I'd be able to find out his first
4  name when I saw him. But his last name is Bistran.
5  Q.     Any other evidence to support your allegation
6  that the DPA allowed you to be harassed and publicly
7  humiliated?
8  A.     No.
9  Q.     Paragraph 31, you allege that the borough of
10 Dunmore and union representative Rich Barth and union
11 representative William Springer were conspiring to
12 deprive you of your constitutional rights. What
13 evidence do you have to support your contention that
14 there was a conspiracy to deprive you of your rights?
15         MS. POLLICK: Objection. Calls for a
16 legal conclusion.
17 A.     The evidence would be just me being in the
18 situation that I'm in after I pass the test the way I
19 was supposed to pass it, and then everything else just
20 passed me out.
21 Q.     Do you have any evidence that the DPA -- let me
22 withdraw that and ask this.
23         Who administered the civil service test?
24 A.     Civil Service Commission.
25 Q.     Did the DPA have any involvement with the

Page 95

1  administering of that test?
2  A.     No.
3          MS. POLLICK: Objection. Calls for
4  speculation.
5  Q.     Do you know whether the DPA had any hand in
6  scoring the test?
7          MS. POLLICK: Objection. Calls for
8  speculation.
9  A.     No.
10 Q.     No, you don't know, or no, they didn't?
11 A.     Did not.
12 Q.     Do you know whether any representatives of the
13 DPA ever met with a member of Borough Council to
14 discuss the civil service test?
15 A.     I don't know of any.
16         MS. POLLICK: Objection. Calls for
17 speculation.
18 A.     I don't know of any.
19 Q.     At paragraph 39 of your complaint, page 9, you
20 allege that the DPA has publicly criticized and
21 admonished its members from discussing the civil
22 service test requirement with agents and employees of
23 the borough of Dunmore. What evidence do you have to
24 support that section?
25 A.     They stuck a thing up on the board. I remember

Page 96

1  reading it. That if anybody was caught talking to
2  anybody they would take disciplinary action against us,
3  the union members.
4  Q.     This is the union posted it?
5  A.     Yes.
6  Q.     It was on the union's board?
7  A.     Yes.
8  Q.     Did you read that notice?
9  A.     Yes.
10 Q.     Did you know to what it was referring?
11 A.     I believe it was referring to myself and
12 Anthony Cali going and talking to Hennigan.
13 Q.     And I think you told us at the time of that
14 meeting you were not on the negotiating committee?
15 A.     No, I was not.
16 Q.     After the award had come out in February, did
17 the negotiating committee continue to exist?
18         MS. POLLICK: Objection. Calls for
19 speculation, lack of personal knowledge.
20 A.     I don't know. I believe it did. I don't know.
21 Q.     What else did the DPA do to publicly criticize
22 or admonish you regarding discussing the civil service
23 test?
24 A.     Nothing. That's it.
25 Q.     That's it. In paragraph 40 you allege that the

Page 97

1  DPA has given false information about the scoring of
2  the civil service test. What evidence do you have in
3  support of that?
4  A.     A letter that stated that all we needed was I
5  believe how many questions were going to be on the test
6  and that 70 was the passing score of the test.
7  Q.     Is this a letter that the DPA put out?
8  A.     Yes.
9  Q.     And do you know from where the DPA got the
10 information regarding that?
11 A.     From the Civil Service Commission.
12         MS. POLLICK: Objection. Calls for
13 speculation.
14 Q.     The May meeting that you and Officer Cali had
15 with Hennigan, you testified that it was initially
16 supposed to be Officers Cali and Bonavoglia going to a
17 meeting?
18 A.     Bonavoglia, yeah.
19 Q.     Officer Bonavoglia was president of the DPA
20 prior to Officer Barth becoming president?
21 A.     Correct.
22 Q.     And Officer Cali was secretary-treasurer of the
23 DPA prior to Officer Springer?
24 A.     Correct.
25 Q.     You were telling us in preparation for the test

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES