IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


POLICE OFFICER TONY GARZELLA,      : No. 05-1626
                    Plaintiff       : Civil Action
                                    :
        vs.                         :
                                    :
BOROUGH OF DUNMORE, BOROUGH OF      :
DUNMORE COUNCIL, BOROUGH OF         :
DUNMORE CIVIL SERVICE               :
COMMISSION, MICHAEL CUMMINGS,       :
Individually and as Councilman,    :
JOSEPH LOFTUS, Individually and    :
as Borough Manager, THOMAS          :
HENNIGAN, Individually and as       :
Councilman, JOSEPH TALUTTO,         :
Individually and as Councilman,    :
LEONARD VERRASTRO, Individually     :
and as Councilman, JOHN BARRETT,    :
Individually and as Civil           :
Service Commissioner, WILLIAM       :
GALLAGHER, Individually and as      :
Civil Service Commissioner,         :
RALPH MARINO, Individually and      :
as Civil Service Commissioner,     :
and DUNMORE POLICE ASSOCIATION,     :
                    Defendants       :

DEPOSITION OF TONY GARZELLA
        Taken in the law offices of Marshall,
Dennehey, Warner, Coleman and Goggin, 401 Adams Avenue,
Scranton, Pennsylvania, on Tuesday, May 2, 2006,
commencing at 9:30 a.m., by Wendy Engler Shade, RDR,
CRR.


* * *
ERSA OF ALLENTOWN
Professional Court Reporters
Commerce Corporate Center Plaza III
5050 Tilghman Street, Suite 120
Allentown, PA  18104
610.366.7119

**TONY GARZELLA**

2

APPEARANCES:

THE EMPLOYMENT LAW FIRM
By:  CYNTHIA L. POLLICK, ESQ.
126 South Main Street, Suite 201
Pittston, PA   18640
  -- For the Plaintiff

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
By:  JOHN P. GONZALES, ESQ.
620 Freedom Business Center, Suite 300
King of Prussia, PA   19406
  -- For the Dunmore Borough Defendants

JENNINGS, SIGMOND
By:  STEPHEN J. HOLROYD, ESQ.
The Penn Mutual Towers
510 Walnut Street, 16th Floor
Philadelphia, PA   19106-3683
  -- For the Dunmore Police Association

ALSO PRESENT:

Joseph Loftus
Billy Springer

3

I N D E X
WITNESSES

page

TONY GARZELLA

Examination by MR. GONZALES          4:11
Examination by MR. HOLROYD           78:3
Re-examination by MR. GONZALES       98:22
Examination by MS. POLLICK           115:19
Re-examination by MR. GONZALES       139:5
Re-examination by MS. POLLICK        154:16

EXHIBITS

1    Exam criteria
For Identification          46:5

2    Letter dated 5-31-05
For Identification          49:1

3    Complaint
For Identification          85:3

4    E-mail dated 7-4-05
For Identification          100:8

5    E-mail dated 3-13-05
For Identification          107:12

6    E-mail dated 4-6-05
For Identification          114:8

7    Letter dated 11-5-87
For Identification          115:21

8    Letter dated 10-5-79
For Identification          117:12

9    Collective bargaining agreement
For Identification          142:5

4

1         MS. POLLICK:  Everything except to form
2    is reserved to trial and we are going to waive reading
3    and signing.
4         TONY GARZELLA, having been duly
5    sworn, was examined and testified as follows:
6              *  *  *
7              EXAMINATION
8    BY MR. GONZALES:
9    Q.    Mr. Garzella, my name is John Gonzales.  I'm an
10   attorney who represents the borough of Dunmore and
11   several of the defendants who you have sued in a
12   lawsuit filed here in the Middle District.  We're here
13   today to take your deposition, which is my opportunity
14   to ask you questions under oath regarding any
15   information that you might have that may be relevant to
16   your lawsuit.  Before I start asking you questions,
17   however, I have a few instructions for you.
18         The first is to give a verbal response
19   to my question.  There's a court reporter seated to
20   your right.  She's taking down all the questions that I
21   ask you and all of your answers.  She can't take down
22   nods of the heads or uh-huhs or huh-uhs, so it's
23   important that you give a verbal response to my
24   questions.  Do you understand that instruction?
25   A.    Yes.

5

1    Q.    Second instruction is to wait until I finish
2    asking a question before you give an answer.  You may
3    be able to anticipate a lot of the questions that I
4    ask, but again it's easier on the court reporter if
5    only one of us is talking at once.  I'll give you the
6    same courtesy.  I'll wait until you finish answering a
7    question before I go on to the next.  Do you understand
8    that instruction?
9    A.    Yes.
10   Q.    The third instruction is the most important.
11   That is if you don't hear or understand a question that
12   I ask, please ask me to rephrase it, because if you do
13   answer the question, I will assume that you heard it
14   and that you understood it.  Do you understand that
15   instruction?
16   A.    Yes.
17   Q.    Is there any reason why you would not be able
18   to testify truthfully today?
19   A.    No.
20   Q.    Have you -- is that --
21   A.    No.
22   Q.    Have you taken any medication in the last 24
23   hours?
24   A.    No.
25   Q.    Have you consumed any alcohol in the last 24

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**TONY GARZELLA**

6

```
1  hours?
2  A.      A beer yesterday.
3  Q.      State your full name, please.
4  A.      Anthony Rocco Garzella.
5  Q.      What's your date of birth?
6  A.      1-12-69.
7  Q.      Where do you live?
8  A.      RR 2, Box 2025, Lake Ariel, PA, 18436.
9  Q.      Do you live there with anyone?
10 A.      My wife.
11 Q.      What is her name?
12 A.      Christina.
13 Q.      How long have you been married?
14 A.      A year and a half maybe.
15 Q.      Do you have any children?
16 A.      No.
17 Q.      Is that your first marriage?
18 A.      Second marriage.
19 Q.      When was your first marriage?
20 A.      1996.
21 Q.      When were you divorced?
22 A.      I believe it was 2000.
23 Q.      Do you have any children from the first
24 marriage?
25 A.      No.
```

7

```
1  Q.      Where did you go to high school?
2  A.      Dunmore High School.
3  Q.      When did you graduate?
4  A.      1988.
5  Q.      Did you go on to any college courses, not
6  police courses, but just regular college courses after
7  you graduated from high school?
8  A.      No.
9  Q.      Where did you get your Act 120 training?
10 A.      Lackawanna.
11 Q.      Junior college?
12 A.      Junior college.
13 Q.      When did you get your Act 120 certification?
14 A.      I believe '91 or '92.
15 Q.      Were you working for a police department at the
16 time?
17 A.      No.
18 Q.      Did you pay for that yourself?
19 A.      Yes.
20 Q.      When was your first police job?
21 A.      Dunmore, '92. I believe November I started.
22 Q.      Did you receive your certification before you
23 started working for the borough?
24 A.      Yes.
25 Q.      When you started in 1992, what was your
```

8

```
1  position with Dunmore?
2  A.      Patrolman.
3  Q.      Did you have to take any type of test when you
4  started working for the borough?
5  A.      No.
6  Q.      Tell me how was it that you got the job? Did
7  you have to apply for it, did you have an interview?
8  Just walk me through the process.
9  A.      You would have an interview -- I had an
10 interview with the chief. I gave him all my
11 certification and he said that at the time there were
12 some guys retiring. He said give us about a month,
13 we'll be calling you. And they called us up, called me
14 up and said you could start.
15 Q.      Who was the chief at the time?
16 A.      Chief Occulto.
17 Q.      Can you spell that, please?
18 A.      I'm not sure.  O-C-C-U-L-T-O, I think. I'm
19 not sure though.
20 Q.      Was he the chief when you actually got hired?
21 A.      Yes.
22 Q.      Now at the time you were hired, how many
23 police officers were there total in the police
24 department?
25 A.      When I first got hired?
```

9

```
1  Q.      Yes, including part-timers, if you know.
2  A.      I know there was -- I believe there was 18
3  full-timers and maybe six part-timers.
4  Q.      When you were hired, were you hired as a
5  full-timer or part-timer?
6  A.      Part-time.
7  Q.      When you first started with the borough, were
8  you what was called a reserve officer?
9  A.      I was a part-timer.
10 Q.      Is there such an officer within the borough of
11 Dunmore Police Department that's known as a reserve
12 police officer or reserve officer?
13         MS. POLLICK: Objection. Lack of
14 personal knowledge and vague.
15 A.      Your answer was?
16 A.      At that time, I don't know. There was no
17 reserve officers.
18 Q.      When did the active reserve officer position --
19 when was that created?
20         MS. POLLICK: Objection. Lack of
21 personal knowledge.
22 Q.      You can answer.
23 A.      It has to be maybe '96, '97.
24 Q.      So that position was created sometime after you
25 started as a police officer in Dunmore, correct?
```

## TONY GARZELLA

**10**

1  A.    I think the active reserve might have come
2  later, maybe '98, but --
3  Q.    But that would have been after you started as a
4  part-timer?
5  A.    They changed names so many times.
6  Q.    At any point in time did you become an active
7  reserve police officer in Dunmore?
8  A.    Yes.
9  Q.    What year did that happen?
10  A.    Maybe '97, '98.
11  Q.    How were you notified that you were an active
12  reserve officer?
13  A.    Just through contract negotiations, they
14  changed our name, because they were working us 40 hours
15  a week, so --
16  Q.    Were you ever a member of the negotiating
17  committee for the FOP?
18  A.    Hum-um.
19  Q.    That's a no?
20  A.    No.  Sorry.
21  Q.    That's all right.  Now, prior to the
22  arbitration award in February of 2005, had you
23  participated in any of the negotiations, whether you
24  were a member of a committee or an informal part of an
25  informal group, did you participate in any of the

**11**

1  negotiations with the borough for the new contract?
2  A.    Hum-um.
3         MS. POLLICK:  Objection.
4  Q.    That's a no?
5  A.    Just the conversation that I had with
6  Councilman Hennigan.
7  Q.    And those conversations that you had, were they
8  as part of the official FOP negotiating group?
9  A.    No.  It wasn't really a negotiation session.
10         MR. HOLROYD:  Just a point, this isn't
11  an FOP lodge.  It's DPA, Dunmore Police Association.
12  Q.    Do you understand when I was using the term FOP
13  that I was -- in reality should have been referring to
14  the DPA, did you understand that?
15  A.    Correct.
16  Q.    And would your answers change if we substituted
17  the term DPA for FOP?
18  A.    No.
19  Q.    When did you have conversations with Councilman
20  Hennigan?
21  A.    I wouldn't know exactly offhand.  Maybe
22  sometime in May.  I'm not sure.
23  Q.    So they would have been conversations that
24  occurred after the arbitration award.  Is that correct?
25  A.    Correct.

**12**

1  Q.    Now, for the arbitration hearing itself, did
2  you actually -- prior to the actual arbitration award,
3  did you participate in any of the arbitration hearings?
4  A.    No.
5  Q.    When was the first time that you had ever heard
6  or there was any discussion that you may have to take a
7  civil service exam?
8  A.    When the award came back.
9  Q.    Did you have any discussions with anyone either
10  in the DPA or in the borough with respect to any type
11  of civil service exam before the civil service
12  arbitrator award in February of 2005?
13  A.    I'm not sure if I quite understand what
14  you're --
15  Q.    That's fine.  I'll rephrase the question.
16  Before the arbitrator's award, did you have any
17  conversations with anyone in the DPA about the need or
18  the possibility that all police officers in the borough
19  would have to take a civil service exam?  Was that ever
20  discussed within the membership of the DPA before the
21  arbitrator's award?
22  A.    It was just noted that there was a good chance
23  that a test would occur.
24  Q.    And how did you find that out?
25  A.    Just by talking to union members.

**13**

1  Q.    Do you remember what union members said that?
2  A.    I believe Billy Springer, Rich Barth.
3  Q.    Anyone else?
4  A.    Not that I can remember, no.
5  Q.    Did they explain to you why a test may have to
6  be administered?
7  A.    Just to -- because we had to be civil service
8  to become active in the pension plan.
9  Q.    Now, have you done any personal research to
10  determine whether or not that's true, that in order to
11  become a member of the pension plan you have to pass a
12  civil service test?
13  A.    Myself, no, I didn't research it.
14  Q.    How about Mr. Cali, has he done any research to
15  your knowledge?
16  A.    I don't know if he did or not.
17  Q.    Did you have any conversations with Mr. Cali
18  where you discussed whether it was necessary to pass a
19  civil service exam in order to receive a pension?
20  A.    Yeah.  We talked about it.
21  Q.    Tell me about those conversations.  What did
22  you talk about?
23  A.    Just like he didn't think it was right that we
24  would have to take a civil service test to get into a
25  pension after we've been there for so long, you know.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

**14**

1 Q.    Did he explain why he believed it wasn't right?

2 A.    No, not that I could recall, but he didn't want

3 to take a civil service test.

4 Q.    Now, you talked about Officer Springer and

5 Officer Barth. Did you have any discussions with any

6 borough official before the arbitrator's award about

7 the possibility that you would have to take a civil

8 service exam in order to receive a pension?

9 A.    Just the conversation with Councilman Hennigan.

10 Q.    My question is specific in time. It's before

11 the actual arbitrator's award. You had said that the

12 conversation you had with Councilman Hennigan --

13 A.    No, not before.

14 Q.    Let me just ask the question again so it's

15 clear. Did you have any conversations with any

16 Councilperson or the borough manager or any member of

17 the Civil Service Commission or any other borough

18 official or employee other than a police officer about

19 the possibility that you would have to pass a civil

20 service test in order to receive a pension?

21         MS. POLLICK: Objection. Compound

22 question.

23 A.    Not that I recall, no.

24 Q.    How did you find out about the arbitrator

25 award?

**15**

1 A.    I think it was e-mailed to me.

2 Q.    By whom?

3 A.    By Councilman Springer, I think.

4 Q.    What did you do when you received the e-mail?

5 A.    Just read it.

6 Q.    Did you have any opinion or feeling about

7 having to take a civil service exam before the

8 arbitrator award?

9 A.    Yeah, nervous.

10 Q.    Now, you said that Officer Cali was -- he had

11 voiced some concern about the need to take a civil

12 service exam, correct?

13 A.    What do you mean, that he wanted to take a

14 test?

15 Q.    No. You testified earlier that Officer Cali

16 had said to you that he didn't think you needed to take

17 a civil service exam in order to receive a pension,

18 correct?

19 A.    Correct.

20 Q.    Did he voice any opinion about whether or not

21 he wanted to take a civil service exam?

22 A.    He didn't want to take one, no.

23 Q.    Why not? Did he explain that to you?

24 A.    No. He just didn't want to take one. He felt

25 that if we had to take it after --

**16**

1 Q.    The conversation you had with Councilman

2 Hennigan in May of 2005, where did that take place?

3 A.    At his house.

4 Q.    Who was there?

5 A.    Myself and Anthony Cali.

6 Q.    Why did you go to his house?

7 A.    Anthony called me up and said that he had some

8 kind of conversation with -- he was friends with

9 Hennigan's wife and I guess they had some kind of

10 disagreement, which I'm not really familiar with. Well

11 anyway, I guess Councilman Hennigan wanted to talk to

12 Anthony Cali and he said come over to my house.

13         In the meantime, he was going over

14 there, I wasn't involved in going over there. Billy

15 Bonavoglia was going with him and I didn't know

16 anything about it. In the meantime Billy Bonavoglia

17 couldn't go. Anthony called me up. He said will you

18 come with me, he said, and see what he has to say, so

19 they wouldn't think that I was trying to negotiate a

20 contract or do anything behind the union's back.

21 Q.    That's what Officer Cali told you?

22 A.    Yeah.

23 Q.    He didn't want the union to think that he was

24 trying to negotiate behind their back?

25 A.    Negotiate a contract behind their back.

**17**

1 Q.    Did he say anything else to you during that

2 conversation?

3 A.    Hum-um.

4 Q.    No?

5 A.    No.

6 Q.    You have to say yes or no.

7 A.    Sorry.

8 Q.    After that conversation, what happened?

9 A.    We went to Hennigan's house.

10 Q.    Now, when you went to Hennigan's house, had the

11 civil service exam been scheduled already?

12 A.    I believe it was, yes.

13 Q.    Had you taken it yet?

14 A.    No.

15 Q.    Who was present for that meeting?

16 A.    The three of us.

17 Q.    Was Mr. Hennigan's wife there?

18 A.    She was there but she had left.

19 Q.    What time of day was this meeting?

20 A.    Afternoon, 2, 3.

21 Q.    Did you notify any member of the DPA that you

22 were going to Mr. Hennigan's house?

23 A.    I didn't, no.

24 Q.    Do you know whether Officer Cali notified

25 anybody at the DPA?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**TONY GARZELLA**

---

18

1  A.    I don't know, no.
2  Q.    Did you ask him whether or not he notified
3  anybody at the DPA?
4  A.    I told him that he should tell them, you know,
5  that we're going there.  I don't know if he ever did or
6  not.
7  Q.    Why did you tell him that?
8  A.    Just because I know there was still
9  negotiations going on where the contract could have
10  been settled or not, we didn't know.
11  Q.    And why is that significant?
12        MS. POLLICK:  Objection.
13  Mischaracterization of prior testimony.
14  A.    Excuse me?
15  Q.    There were negotiations going on at the time?
16  A.    I believe right down to the last minute before
17  the arbitration came back.
18  Q.    And you felt that the DPA should be aware of
19  the fact that there were two police officers who were
20  talking to a Borough Council member during the
21  negotiating process, correct?
22        MS. POLLICK:  Objection.
23  Mischaracterization of prior testimony.  Assumes facts
24  not into evidence.
25  Q.    Correct?

---

19

1  A.    Right.
2  Q.    Now, when you went to the house, tell me what
3  happened.
4  A.    They just spoke back and forth.  He wanted to
5  know -- like Anthony asked Councilman Hennigan like how
6  the situation transpired, where we were, we went to
7  arbitration and how the whole test came about and that
8  we thought it could have been settled and it wasn't
9  settled.
10        And Councilman Hennigan said there's
11  facts on both sides that are at fault and basically
12  that's it.  Councilman Hennigan was worried because he
13  said that we can't hire everybody, but to pay all the
14  money up front, that it would be too much at one time.
15  And I mean it was basically just between them two.
16  Q.    Were part of the issues, and correct me if I'm
17  wrong, part of the issues that were being negotiated
18  between the DPA and the borough was whether or not the
19  reserve officers could become full-time police officers
20  and receive the same pay and benefits as full-time
21  police officers?
22        MS. POLLICK:  Objection.  Assumes facts
23  not into evidence and vague.  No time.
24  Q.    Go ahead.  You can answer it.
25  A.    Correct.

---

20

1  Q.    So when you're talking about what Mr. Hennigan
2  is referring to the fact that people wanted to be paid
3  quickly or immediately, are you talking about bringing
4  the reserve officers' pay up to the pay or equal pay of
5  the full-time officers?
6  A.    Through a scale.  Not all at one time.
7  Q.    And you were aware before this meeting with Mr.
8  Hennigan that that was one of the sticking points of
9  the negotiations, did you not?
10        MS. POLLICK:  Objection.  Assumes facts
11  not into evidence.
12  A.    Correct.
13  Q.    Now, the other issue of course that was a
14  sticking point in the negotiations was how could
15  reserve officers get into the pension system, correct?
16        MS. POLLICK:  Objection.  Assumes facts
17  not into evidence.
18  A.    One more time, please.
19  Q.    One of the other sticking points that you were
20  aware of during the negotiating process was how the
21  reserve officers could become eligible to receive a
22  pension?
23        MS. POLLICK:  Same objection.
24  A.    Correct.
25  Q.    What if anything did Officer Cali say to Mr.

---

21

1  Hennigan?
2  A.    He just said if something could be worked out,
3  you know, where it wouldn't cost a fortune for the
4  borough all at one time, if it could have been
5  structured, if the contract could be stretched out say
6  at least two more years, and he just said bring it back
7  to your union to see what they would go for.
8  Q.    How did you feel about that meeting?  Did you
9  feel comfortable that Officer Cali, who was not a part
10  of the negotiating committee of the DPA, was
11  discussing --
12  A.    He was part -- he was part of the negotiating
13  committee.
14  Q.    He was, I'm sorry.  Who was on the negotiating
15  committee for the DPA at that time?
16  A.    I believe Billy Springer, Rich Barth, Billy
17  Bonavoglia and Anthony Cali.
18  Q.    To your knowledge, did any member of that
19  committee conduct negotiations without any other member
20  of the committee present?
21        MS. POLLICK:  Objection.  Lack of
22  personal knowledge.  Assumes facts not into evidence.
23  A.    Not that I know of.
24  Q.    Did you take any notes from that meeting?
25  A.    Hum-um.

---

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

22

1  Q.    That's a no?

2  A.    No.

3  Q.    Did Officer Cali take any notes?

4  A.    I don't think so, no.

5  Q.    Do you know whether Mr. Hennigan took any

6  notes?

7  A.    No.

8  Q.    How long did the meeting last?

9  A.    About an hour.

10 Q.    What else was discussed during that meeting, if

11 anything?

12 A.    I told him that I didn't think it was fair that

13 we were here for so long and we would have to take a

14 civil service test after working almost ten years

15 full-time when there was other people in the borough

16 that enjoyed a pension, full-time salary, I mean, and

17 they're not civil servants. They never took a test.

18 Then we have some guys that actually just paid a dollar

19 to become civil service.

20 Q.    What else did you say?

21 A.    That's just -- I didn't say too much there.

22 Q.    When you said that, did Mr. Hennigan respond in

23 any way?

24 A.    I can't remember exactly what his response was.

25 Q.    How did the meeting end?

23

1  A.    Just between Anthony and Thomas Hennigan, they

2  just -- he just asked him to bring back to the union to

3  see if something could be worked out where we can

4  stretch the time frame of the contract, instead of like

5  I think it was a four or five year contract, to stretch

6  it out to six or seven years so the borough wouldn't

7  have the burden of paying everything to the guys.

8  Q.    Was Officer Cali, was he receptive to that

9  proposal?

10 A.    Um-hum.

11 Q.    Is that a yes?

12 A.    Yes. Sorry.

13 Q.    How about you? What did you think of that

14 proposal?

15 A.    I wasn't really too sure. I didn't think

16 anything of it really. I mean after I left there, that

17 was the end of it.

18 Q.    Did Mr. Hennigan threaten you during that

19 meeting?

20 A.    No.

21 Q.    Did he threaten Officer Cali during that

22 meeting?

23 A.    No.

24 Q.    Prior to that meeting, did you ever have any

25 occasion to talk to Mr. Hennigan, you know,

24

1  unofficially, see him around town?

2  A.    No. That was the first time I met him.

3  Q.    How about Officer Cali, did you ever know

4  whether he had any contacts with Mr. Hennigan before

5  that?

6          MS. POLLICK: Objection. Lack of

7  personal knowledge.

8  A.    I don't know.

9  Q.    How did Officer Cali know Mr. Hennigan's wife?

10 A.    I believe she ran like a vacation company. If

11 that's the next -- I mean I don't know if that's the

12 only, but I know she books like vacations for people.

13 Q.    Had you had any conversations with her before

14 that day?

15 A.    No. I don't know.

16 Q.    Now, you said she left. Did she leave before

17 the meeting started or she left at some point while the

18 meeting was ongoing?

19 A.    Before.

20 Q.    When the meeting was over, what did you and Mr.

21 Cali do?

22 A.    I went home.

23 Q.    What did Officer Cali do?

24 A.    I don't know.

25 Q.    Did you or he speak after the meeting? In

25

1  other words, as you're walking to your cars or

2  whatever, did you have any discussion about hey, how

3  did that go or anything like that?

4  A.    I told him, I said if something's going to

5  happen, you got to notify the union and let them know

6  what's going on.

7  Q.    What did you do to study for the civil service

8  exam?

9  A.    Study guide that the borough gave us. I bought

10 one of them civil service books just to practice up.

11 Q.    Anything else?

12 A.    No.

13 Q.    When did you purchase the book?

14 A.    Maybe about a month after we found out we would

15 have to take a test, if not sooner. I don't remember.

16 Q.    So would it have been sometime in February or

17 March of 2005?

18 A.    Correct.

19 Q.    And the study guide, when did you start using

20 that?

21 A.    As soon as we received it.

22 Q.    When was that?

23 A.    I think it was like six days before the test.

24 Q.    Did you do anything else other than use the --

25 strike that.

## TONY GARZELLA

26

1          When you bought the practice book, did
2 you work through that book, use it?
3 A.    Sure. Yes.
4 Q.    Was it helpful?
5 A.    Yes.
6 Q.     Do you know whether other DPA members offered
7 to help other officers in trying to study or prepare
8 for the civil service exam?
9 A.    Yes.
10        MS. POLLICK:  Objection.  Lack of
11 personal knowledge.
12 Q.    Who tried to help the other officers?
13 A.    I know Patrolman Springer helped some guys.
14 Q.    Anyone else?
15 A.    Not that I know of.
16 Q.    How did Officer Springer help?
17 A.    I guess he had groups, like groups of a couple
18 guys around and they just went over things and studied
19 them.
20 Q.    Did you ever participate in any of those
21 groups?
            No.
23 Q.    Why not?
24 A.    I think I might have in one, a short one.
25 Q.    How come you only went to one?

27

1 A.     I didn't know there was any more. I wasn't
2 notified that there was more.
3 Q.     Did you talk to Officer Springer and ask him
4 whether there were going to be any more?
5 A.     I don't think so.
6 Q.     Were there other -- was there more than one?
7 A.     I don't know if there was any more than one.
8 Q.     Did you talk to any other police officers and
9 ask them what they were doing to study for the test?
10 A.    A couple of the guys when we would get
11 together, but as far as I know, nothing really
12 materialized where we actually got together, so I just
13 did it on my own.
14 Q.    You used the study guide, the book that you
15 bought, you went to one meeting with Officer Springer's
16 group. Anything else that you did to prepare for the
17 civil service exam?
18 A.    Just brushed up on my academics.
19 Q.    How did you do that?
20 A.    Just by doing math problems and looking stuff
21 up on the computer and refreshing your memory on things
22 that you forget when you're out of school.
23 Q.    Did you talk to any police officers from
24 neighboring police departments who had taken a civil
25 service exam?

28

1 A.    Yeah.
2 Q.    Who did you speak to about that?
3 A.    One of our friends.
4 Q.    Who is that?
5 A.    Danny Jones.
6 Q.    Where does he work?
7 A.    Pocono Mountain Regional.
8 Q.    What did you discuss with him about the civil
9 service test?
10 A.    Just the test that we were taking was familiar
11 -- was similar to the test that he took up at Po...
12 Regional, so I was just asking him, you know, wh... kind
13 of test it was, you know, was it an easy ... a
14 hard test, you know.
15 Q.    The conversation that you had with D... Jones,
16 was that before or after you took your ... ...ore?
17 A.    It was before.
18 Q.    How did you know it was a similar test ...
19 one at Pocono Regional?
20 A.    Because the Police Chiefs Association wa...
21 giving us the test and we knew that they gave the test up t... ere.
      ...the Standard and Associa...
23 Q.    Standard and Associates wa... .
24 A.    Is the company that gives the test.
25 Q.    You knew that before the test was adm...  ...ed,

29

1 correct?
2 A.    Correct.
3 Q.    And you knew that was through the PA... ...s
4 Association?
5 A.    That they were going to give it to us.
6 Q.    Yes. You knew that before the test wa... ...
7 to you, correct?
8 A.    Correct.
9 Q.    And you were aware that that wa... .
10 test that was given --
11        MS. POLLICK:  Objection.  Lack
12 personal knowledge.
13 A.    Correct.
14 Q.    Did Danny Jones have any good adv... ...u in
15 taking the test?
16 A.    No. He just said, you know, th... ...n
17 it, there was writing on it, there was all diffe...
18 things on it, and that each section wa...
19 Q.    The test that you actually took, was i...
20 to the one that Danny described to you?
21        MS. POLLICK:  Objection.  Lack o...
22 personal knowledge.
23 A.    I don't know. I mean I didn't see the
24 that he took, but I guess it could be.
25 Q.    When I asked you the question, Dann...  ...d

## ELECTRONIC REPORTING STENOGRAPHIC AFFILIAT...

## TONY GARZELLA

30

1 to you the type of test he took, correct?
2 A.    Correct.
3 Q.    He told you that it was timed and it had
4 certain sections?
5 A.    Right.
6 Q.    Based on what Danny told you, obviously you
7 didn't sit with Danny to take the test, but based on
8 what Danny told you, was the test that you took similar
9 to the test that Danny described to you?
10 A.    Yes.
11 Q.    Other than talking to Danny Jones, did you talk
12 to any other officers who had taken a civil service
13 exam before you took the one in Dunmore?
14 A.    Not that I can recall.
15 Q.    Did Danny give you any tips on how to prepare?
16 A.    No, not really.
17 Q.    The exam itself, when did that take place?
18 A.    Which one now?
19 Q.    The one you had to take, the civil service
20 exam.
21 A.    I believe it was the 21st of May.
22 Q.    Where did it take place?
23 A.    At Dunmore High School.
24 Q.    Who took the test that day?
25 A.    All the active reserve officers.

31

1 Q.    And did all the active reserve officers show up
2 for the test?
3 A.    I believe so, yes.
4 Q.    Other than the one conversation with Councilman
5 Hennigan, did you have any other conversations with any
6 other Borough Council members before you took the civil
7 service exam?
8 A.    Not that I recall.
9 Q.    Did you ever talk to Mr. Loftus, the borough
10 manager, before you took the civil service exam?
11 A.    About --
12 Q.    About the test.
13 A.    I might have briefly.
14 Q.    Do you remember what that conversation was
15 about?
16 A.    Just I think it was when the contract came back
17 or something or there might have been a test involved
18 with it or something.
19 Q.    What does that mean, when the contract came
20 back?
21 A.    When the contract came back that he thinks that
22 we would have to take a civil service test to get our
23 jobs, our full-time jobs.
24 Q.    You mean when the arbitration award came out?
25 A.    Yeah.

32

1 Q.    So when you had this conversation it would have
2 been closer in time to the February 2005 arbitrator's
3 award?
4 A.    I don't remember exactly.
5 Q.    Did Mr. Loftus threaten you during that
6 conversation?
7 A.    No.
8 Q.    Before you took the civil service test, did Mr.
9 Loftus ever threaten you?
10 A.    No.
11 Q.    The members of the Civil Service Commission,
12 did you know who they were before the exam was
13 administered?
14 A.    Yes. I don't know. I only know one person on
15 the board.
16 Q.    Who is that?
17 A.    Mr. Barrett.
18 Q.    How do you know him?
19 A.    He was my school teacher.
20 Q.    Did you ever have any -- did you ever have any
21 conversations with Mr. Barrett about the civil service
22 exam?
23 A.    No.
24 Q.    And you never -- you don't know who the other
25 two members are. Is that correct?

33

1 A.    I may know Gallagher if I see him, but I'm not
2 -- Marino, I don't know.
3 Q.    Did you ever have any conversations with Mr.
4 Gallagher about the civil service test?
5 A.    No.
6 Q.    Did you ever have any conversations with Mr.
7 Marino about the civil service test?
8 A.    Hum-um.
9 Q.    That's a no?
10 A.    No.
11 Q.    The Civil Service Commission solicitor, Frank
12 O'Neill, do you know him?
13 A.    No.
14 Q.    Ever have any conversations with him before the
15 civil service test?
16 A.    Not that I'm aware of, no.
17 Q.    Councilman Joseph Talutto, did you ever have
18 any conversations with him about the civil service
19 test?
20 A.    Before or after?
21 Q.    Before.
22 A.    No.
23 Q.    Leonard Verrastro, V-E-R-R-A-S-T-R-O, did you
24 ever have any conversation with Councilman Verrastro
25 before the civil service test?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

34

1 A.   Hum-um.
2 Q.   That's a no?
3 A.   No.
4 Q.   Councilman Michael Cummings, did you ever have
5 any conversations with him before the test?
6 A.   No.
7 Q.   Now, you allege in your complaint that you
8 engaged in protected speech in May and June of 2005 and
9 then were retaliated for engaging in that speech. What
10 speech did you engage in May and June of 2005 that
11 you believe was protected under the First Amendment?
12 A.   Probably just going against the civil service
13 test, being vocal against it.
14 Q.   What statements did you make in May of 2005?
15 Let's focus on that time period.
16 A.   It wasn't fair that we had to take it.
17 Q.   When did you say that?
18 A.   I can't say exactly when.
19 Q.   Who did you say it to?
20 A.   A few of the union members.
21 Q.   Who?
22 A.   Probably guys on my shift, guys on the -- I
23 can't exactly name everybody. I mean --
24 Q.   I need to know exactly everybody that you made
25 that statement to.

35

1 A.   I would say probably Ray Reynolds, Jason
2 Harshman, Billy Bonavoglia, Anthony Cali, probably
3 Billy Springer, Rich Barth. That's about as much as I
4 can remember.
5 Q.   And these would be conversations you would have
6 while you're on duty or --
7 A.   Correct.
8 Q.   -- in the locker room or somewhere in the
9 police station?
10 A.   Right.
11 Q.   Did anybody else share your views?
12 A.   Oh, yes. They all felt the same way.
13 Q.   Did you ever tell any Council member before you
14 had to take the test that you believe that the civil
15 service test was -- that it was unfair that you had to
16 -- strike that.
17        Did you ever tell any Borough Council
18 member before the test that you felt that taking the
19 test was unfair?
20 A.   Yeah. I told Councilman Hennigan.
21 Q.   Other than Councilman Hennigan, did you tell
22 anybody else?
23 A.   I don't think so, no.
24 Q.   Now, when you had that -- this is the
25 conversation when you're talking about Councilman

36

1 Hennigan, you're referring to the conversation you had
2 in his house with Officer Cali, correct?
3 A.   Correct.
4 Q.   That conversation took place after the test had
5 already been scheduled?
6 A.   After it's been scheduled.
7 Q.   Before you took it, but after it was scheduled,
8 correct?
9 A.   Correct.
10 Q.   You had no other conversations with any other
11 Council members before the civil service test, correct?
12 A.   Not that I could recall.
13 Q.   You had no conversations with Joe Loftus, the
14 borough manager, about the test being unfair before you
15 took the civil service test. Is that correct?
16 A.   Before I took the civil service test, no.
17 Q.   And you never told any member of the Civil
18 Service Commission that you believed that taking the
19 civil service test was unfair. Is that correct?
20 A.   I never did personally, no.
21 Q.   Now, did you send an e-mail, a letter or any
22 type of written statement to any Borough Council member
23 saying the civil service test was unfair before
24 you took it?
25 A.   I didn't send any letters, no.

37

1 Q.   How about to the Civil Service Commission
2 members, did you send any letters to them?
3 A.   No.
4 Q.   How about to Mr. Loftus, did you send any
5 letters to him saying the civil service test was
6 unfair?
7 A.   No.
8 Q.   Now, what other speech that you engaged in do
9 you believe was protected under the First Amendment?
10 A.   Speech?
11 Q.   Yes. You said that -- when you're saying that
12 you felt that taking the test was unfair, you believe
13 that that was speech that was protected under the First
14 Amendment?
15 A.   Correct.
16 Q.   What else did you say that you felt was
17 protected?
18 A.   That was just -- it was just being vocal
19 against going against the test.
20 Q.   What did Councilman Hennigan do to your
21 knowledge in retaliation for the meeting you had with
22 him where you said the test was unfair?
23 A.   Well, they said I failed the test when actually
24 I had passed it. It allowed other people to move up in
25 my space where I had seniority. I mean I went from

## ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

## TONY GARZELLA

**38**

1 number 11 on the list to number 21 at the time before
2 we lost some guys. So I mean that's --
3 Q.     What did Mr. Hennigan have to do with the
4 scoring of the test?
5 A.     I don't think he had anything to do with the
6 scoring of the test.
7 Q.     Did any Borough Council member participate in
8 the scoring of the test?
9         MS. POLLICK: Objection. Lack of
10 personal knowledge.
11 A.     I don't know if they did or not.
12 Q.     Do you know whether Mr. Loftus scored the test?
13         MS. POLLICK: Objection. Lack of
14 personal knowledge.
15 A.     I don't know.
16 Q.     Do you know whether any member of the Civil
17 Service Commission scored the test?
18         MS. POLLICK: Objection. Lack of --
19 A.     I don't know who scored the test.
20 Q.     Other than failing the test, was there anything
21 else that any Borough Council member did to your
22 knowledge that you believe was in retaliation for
23 making a comment that the test was unfair?
24 A.     After failing the test?
25 Q.     At any time.

**39**

1 A.     At any time? Not that I know of, no.
2 Q.     Now, you said that you didn't fail the test.
3 Is that correct?
4 A.     No, I didn't fail the test.
5 Q.     Explain to me why you believe you didn't fail
6 the test.
7 A.     Because I was told when I took the test that
8 all I needed was a 70 to pass the test and I took the
9 test and I passed it with above a 70.
10 Q.     Now, before you took the test, did the DPA have
11 any meetings to explain what the procedure would be for
12 the civil service exam itself?
13 A.     I believe Officer Springer sent out an e-mail
14 stating that we needed a 70 percent on the test to
15 pass.
16 Q.     Was that the only e-mail you received from any
17 of the leadership in the DPA about the procedures for
18 taking the test and the scoring?
19 A.     Yes, I believe so.
20 Q.     When did you receive that e-mail?
21 A.     I couldn't say. I'd have to look it up.
22 Q.     Did you keep a copy of that?
23 A.     There's a copy of it.
24         MS. POLLICK: You have it.
25 Q.     Other than that one e-mail, was there any other

**40**

1 written communication you received from the leadership
2 of the DPA about the test, the procedures for taking
3 the test?
4 A.     No.
5 Q.     How about the borough itself, were there any
6 meetings with any borough officials where they
7 explained the procedures for the test?
8 A.     I knew our union representatives went to some
9 civil service meetings and they --
10 Q.     What union reps went to the civil service
11 meetings with the borough?
12 A.     I think Officer Springer, Barth, Anthony Cali
13 and Billy Bonavoglia, the guys that were on our
14 negotiating committee.
15 Q.     Did that negotiating committee then communicate
16 with the membership about what happened at the meeting
17 with the borough?
18 A.     Correct. That's when they came back and said
19 that we needed -- it was a 70 percent pass.
20 Q.     And that was communicated to the membership
21 through the e-mail from Springer, correct?
22 A.     I believe so, yes.
23 Q.     Was there any other communications from the
24 members of the negotiating committee about how the test
25 would be administered or scored?

**41**

1 A.     Just probably guys talking.
2 Q.     What did the guys talk about?
3 A.     Just that it was I think they said like 75
4 questions and you needed a 70 to pass it.
5 Q.     On the day of the exam, you said it was at
6 Dunmore High School?
7 A.     Correct.
8 Q.     Who was actually in the room other than the
9 officers taking the test?
10 A.     Attorney O'Neill and the chief from Bloomsburg.
11 I don't know his name.
12 Q.     Did either Mr. O'Neill or the chief from
13 Bloomsburg say anything before the test?
14 A.     Yes.
15 Q.     What did they say?
16 A.     The chief could pass out the test and I guess a
17 couple of the guys, he noticed they were really nervous
18 and stuff and he explained the situation to them, you
19 know, that it wasn't like a civil service test, that we
20 basically already had the jobs and we weren't like new
21 hirees taking a test.
22         So he said that, you know, he saw that
23 there was a lot of guys that were uptight. And he
24 basically just said, you know, calm down, don't worry
25 about it, it's not a test that, you know, is designed

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

42

1  to make anybody really fail.  And he said but, however,
2  if you get more than I think it was 22 or 23 answers
3  wrong, he said, you will fail the test.  And that's it.
4  We just took it from there.
5  Q.     Did they hand anything out to you other than
6  the test?
7  A.     Yes.  A piece of paper.
8  Q.     What was on the piece of paper?
9  A.     Just 70 percent was passing for the written
10 section, I think, and 30 percent was for the oral
11 interviews.  It was like a basic piece of paper.
12 Q.     Did that piece of paper say anything else, to
13 your knowledge?
14 A.     It did, but I can't recall exactly what it
15 said.
16 Q.     Was there anything on that piece of paper that
17 explained that you had to get a 70 percent in each of
18 the sections?
19 A.     No.
20 Q.     The test itself, were there any instructions on
21 the test about what a passing grade would be?
22 A.     No.
23 Q.     How long did you have to take the test?
24 A.     I think it was a 75 minute test, but I'm not
25 sure.

43

1  Q.     Was there any more discussion before the test
2  was taken other than what you've already testified to,
3  either from the chief of Bloomsburg or from Mr.
4  O'Neill?
5  A.     No.
6  Q.     Did Mr. O'Neill stay in the room for the
7  duration of the test?
8  A.     I believe he did.  I'm not sure though.  He sat
9  behind me.
10 Q.     Say that again.
11 A.     He sat behind me, so --
12 Q.     How about the chief from Bloomsburg, was he
13 there for the duration of the test?
14 A.     Yes, he was.
15 Q.     When the test was finished, what happened?
16 A.     They just collected them.
17 Q.     Other than failing the test, do you believe
18 there's anything else that the borough did to retaliate
19 against you for complaining about having to take the
20 test?
21 A.     I didn't fail the test.
22 Q.     Anything else that anybody from the borough did
23 to retaliate against you other than what you've already
24 testified to?
25 A.     No.

44

1  Q.     The other members of the police department who
2  complained about the test, were they retaliated
3  against?
4  A.     No.
5  Q.     Do you know why?
6  A.     What do you mean now?
7  Q.     Well, you said that you weren't the only one
8  that complained that the test was unfair, correct?
9  A.     Well, mostly all the guys complained.
10 Q.     Right.  But only three failed the test, right?
11        MS. POLLICK:  Objection.
12 Mischaracterization of testimony.  Assumes facts not
13 into evidence.
14 A.     We didn't fail.
15 Q.     According to the borough only three failed the
16 test.
17 A.     According to the borough.
18 Q.     Correct?
19 A.     Correct.
20 Q.     But everybody complained that it was unfair?
21        MS. POLLICK:  Objection.  Lack of
22 personal knowledge.
23 A.     Basically everybody that I know.
24 Q.     So my question is how come the borough didn't
25 fail everybody else but only failed you three?

45

1  A.     I don't know.
2  Q.     Following the test, when did you get your
3  results?
4  A.     I know it was -- I think it was like ten days
5  after everybody else was notified.  They had an old
6  address.  They mailed it to an old address.
7  Q.     You have no reason to believe that that was
8  done intentionally so that you wouldn't get your score,
9  do you?
10 A.     No.
11 Q.     You got your score in the mail?
12 A.     Correct.
13 Q.     Was that a letter that you received from Mr.
14 O'Neill?
15 A.     Um-hum.
16 Q.     That's a yes?
17 A.     Correct.
18 Q.     What did you do when you got the letter?
19 A.     Read it, couldn't believe it.
20 Q.     What did you do then after that?
21 A.     I was just in shock that they did stuff like
22 that.
23 Q.     Did you call anybody in the DPA?
24 A.     I might have and I'm not sure if I did or not.
25 I can't say for sure.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

## TONY GARZELLA

46

1 Q.     I'm going to show you a document that we'll
2 mark as Garzella 1.
3        MS. POLLICK:  Before you ask a question,
4 there is some scribble on the right which I don't
5 believe is how the document was given to them
6 originally and also it looks like underlined portion of
7 the document.  So that would be --
8        MR. GONZALES:  Were you there?
9        MS. POLLICK:  No, but I've seen it
10 without that stuff on it and if you looked at the
11 exhibit, the documents I sent you, you would have
12 noticed that there was nothing on it.
13        MR. GONZALES:  We'll let the witness
14 testify to that.
15        MS. POLLICK:  I'm just placing the
16 objection on the record and I would appreciate that you
17 allow me to do that without criticism.
18        MR. GONZALES:  Anything else?
19        MS. POLLICK:  No, I'm fine.
20        MR. GONZALES:  Good.
21 Q.     Officer Garzella, looking at Garzella 1, is
22 this a document that you received that day before the
23 test?
24        MS. POLLICK:  Objection.  Assumes facts
25 not into evidence.  There is writing on the right.

47

1 A.     It's -- there was none of this here or that.
2 Q.     What was on the document that you received?
3 Was anything that is on that document in front of you
4 on the document that you received before the test?
5 A.     Yeah, it's the same document.
6 Q.     The typewritten portion is what you
7 received, the handwritten material that your attorney
8 was testifying about at the bottom, that was not there,
9 correct?
10 A.     Correct.
11 Q.     Was anything that was on Garzella 1 a surprise
12 to you when you got it?
13 A.     Not really, no.
14 Q.     Did anyone have any questions about what was on
15 Garzella 1 when it was handed out?
16 A.     Not that I know of, no.
17 Q.     Was there any discussion about this document by
18 the chief at Bloomsburg, Mr. O'Neill or anybody that
19 was there?
20 A.     No.  By that time we were taking the test.
21        MS. POLLICK:  Are you going to make
22 copies of this?  Because normally people give us a copy
23 of the exhibits.
24        MR. GONZALES:  Sure.
25        MS. POLLICK:  Because -- do you have

48

1 them now?  Do you have extra copies to hand us?
2        MR. GONZALES:  No.  Do you want us to
3 make some?
4        MS. POLLICK:  I would like it because I
5 do like to look at them and write on them, the exhibits
6 that you hand to my client.
7        MR. GONZALES:  Okay.  You want to do
8 that now?
9        MS. POLLICK:  Yes, I would like whatever
10 you're going to use, if you could make a copy for me so
11 you could hand it over.  That's usually what we do in
12 the depositions.  Every single deposition I'm in,
13 that's how it works.  So I would appreciate it, yes.
14 The documents are going to --
15        MR. GONZALES:  I don't have extra
16 copies, so I was going to show them and then make
17 copies later, but I'll be more than happy to take a
18 break and make a copy.
19        MS. POLLICK:  That sounds phenomenal.  I
20 appreciate that.
21        (Short recess.)
22 BY MR. GONZALES:
23 Q.     Officer Garzella, Garzella 2, is that the
24 letter you received telling you what your scores were?
25 A.     Correct.

49

1 Q.     And when you got that, did you go and talk to
2 anybody either at the borough or the DPA about it?
3 A.     I believe I did.
4 Q.     Who did you talk to first?
5 A.     I don't remember.  I might have talked to Rich
6 Barth or Billy Springer, I'm not sure.
7 Q.     What did you tell them, whoever it was you
8 talked to?
9 A.     Just what was going on because they were saying
10 that I failed the test and I actually passed the test.
11 Q.     Was there anyone else who took the test that
12 day who got less than 70 on one of the sections of the
13 written test but was allowed to pass it?
14        MS. POLLICK:  Objection.  Lack of
15 personal knowledge.
16 A.     I don't know, I never saw the other guys'
17 scores at that time.
18 Q.     Did you have any discussion with anybody to
19 find out how they did?
20 A.     Yeah.  I talked to some guys.
21 Q.     Of the guys that you spoke to, did any of them
22 fail a section -- get less than a 70 on any of the
23 sections of the written test but --
24 A.     Yeah.
25 Q.     -- pass, get an overall passing score?

## ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

## TONY GARZELLA

50

1  A.    Yes.
2  Q.    Who was that?
3  A.    Jody Sibio and Anthony Cali.
4  Q.    And to your knowledge did the borough give
5  Officer Sibio a passing grade?
6  A.    I don't know what his grade was.  when I talked
7  to him, he just said he passed every section except for
8  one, but I don't know what his final score was.
9  Q.    Do you know what the borough's position with
10 respect to Officer Sibio was, whether he passed or
11 failed the written test?
12         MS. POLLICK:  Objection.  Lack of
13 personal knowledge.
14 A.    Technically he passed the test.
15 Q.    Did you hear my question?
16 A.    Say it again.
17 Q.    All right.  Do you know what the borough's
18 position was with respect to Officer Sibio and whether
19 he passed or failed the test?
20 A.    The borough's position is that he failed the
21 test.
22         MS. POLLICK:  Lack of personal
23 knowledge.
24 Q.    And to your knowledge in speaking with Officer
25 Sibio, you know that he got a less than 70 percent

51

1  score on one of the sections of the written test,
2  correct?
3  A.    Correct.
4  Q.    Officer Cali, you spoke with him and he was one
5  of the other officers who you spoke with that got less
6  than a 70 percent on one of the sections of the written
7  test, correct?
8  A.    Correct.
9  Q.    Do you know what the borough's position was
10 with respect to Officer Cali, whether he passed or
11 failed the test?
12         MS. POLLICK:  Objection.  Lack of
13 personal knowledge.
14 A.    They said that he failed the test.
15 Q.    Now, do you know of any other police officers
16 who the borough said failed the test other than Officer
17 Cali, Officer Sibio and yourself?
18 A.    Just the three of us.
19 Q.    Do you know any other officers who got less
20 than a 70 percent on one of the sections of the written
21 test?
22 A.    Hum-um.  No.
23 Q.    Did you personally talk to anybody at the
24 borough about the way the test was scored?
25 A.    I think I talked to Councilman Nardozi,

52

1  Councilman Talutto and Councilman Burke actually
2  tracked me down and wanted to know what happened with
3  the scoring.
4  Q.    When did you talk to Councilman Nardozi?
5  A.    Maybe about a week after I got my results.
6  Q.    What did you talk about?
7  A.    Just that the element issue, about the
8  elements.
9  Q.    What did you tell him?
10 A.    I said to him that they said that I failed one
11 of the elements, which is not an element, it's actually
12 an area on the test, and that's not -- that's not right
13 what they're doing.
14 Q.    What did he say?
15 A.    He said that he would look into it.
16 Q.    Did he say anything else?
17 A.    No, not that I could recall.
18 Q.    Do you know whether he did look into it?
19 A.    I don't know, no.
20 Q.    Did he ever get back to you after that
21 conversation?
22 A.    I had called him up to see if there was any way
23 I can get a copy of the civil service rules and I asked
24 him when he was down there if he could get me a copy.
25 Q.    Did he?

53

1  A.    No, he didn't.
2  Q.    At that time did you have a copy of the civil
3  service rules?
4  A.    No.
5  Q.    Any other conversations with Councilman
6  Nardozi?
7  A.    No.
8  Q.    Did I say congressman?  I meant Councilman.
9  A.    Councilman.
10 Q.    Councilman Talutto, when did you talk to him
11 about the test?
12 A.    I was driving by his house and he flagged me
13 in.  He was sitting in his garage.  I was driving by in
14 the police car and he flagged me in and just asked me
15 what happened with the test and stuff.  And he said do
16 you have your test scores with you and I said yeah.
17 And I showed him the test scores and he looked at them
18 and he said that's not right what they did.  You know,
19 it should never have been -- never did I ever see a
20 test that was ever scored that way.
21 Q.    Did he say anything else to you?
22 A.    No.
23 Q.    Did you say anything to him?
24 A.    No.
25 Q.    Did you have any further contact with

## ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

## TONY GARZELLA

54

1 Councilman Talutto about the test?
2 A.    No.
3 Q.    Did he say he was going to do anything about
4 it?
5 A.    Like I said, he just said he was going to look
6 into it.
7 Q.    Do you know whether he did?
8 A.    I don't know.
9 Q.    But he never got back to you, correct?
10 A.    Never got back to me.
11 Q.    Did you ever follow up with him and find out?
12 A.    No, not really.
13 Q.    Councilman Burke, when did you talk to him?
14 A.    I pulled into the Turkey Hill in Dunmore.
15 Q.    The one across from the police station?
16 A.    No, the other one. And he just pulled up
17 alongside of me and he was getting out of the car, saw
18 me, came over to me and just started asking me about
19 the test and stuff and what they did and about the
20 scoring.
21 Q.    What did you tell him?
22 A.    Just that the borough said that I failed the
23 test because I failed the section on math. They were
24 saying I failed the math section.
25 Q.    What did he say if anything?

55

1 A.    He just couldn't believe it. He said he never
2 saw a civil service test scored that way ever before.
3 Q.    Did he say anything else?
4 A.    That he was -- would look into it.
5 Q.    Did you have any further contact with
6 Councilman Burke?
7 A.    No.
8 Q.    Did you ever follow up with him to find out if
9 he had done anything for you?
10 A.    A couple times, but I just couldn't catch him.
11 Q.    I noticed in your lawsuit you sued Councilman
12 Talutto but you did not sue Councilman Nardozi or
13 Councilman Burke. Do you know why?
14 A.    Correct. Correct. Yes.
15 Q.    Why?
16 A.    Well, supposedly they're -- well, there was a
17 Council meeting where the rest of the guys, because
18 they were saying I failed the civil service test, had a
19 discussion on either firing myself and Anthony or
20 laying us off, I'm not sure, and Councilman Burke and
21 Nardozi came to our defense and said, you know, you
22 can't get rid of these guys, you know. And then at
23 some point I think it was said that they actually did
24 pass the civil service test, but I mean that's
25 something that I can't confirm nor, you know.

56

1 Q.    So you believe that there was a meeting of the
2 Borough Council where they discussed firing those
3 officers who failed the civil service test?
4 A.    Correct.
5 Q.    Is that your understanding?
6         MS. POLLICK: Objection.
7 Mischaracterization. Assumes facts not in evidence.
8 A.    There was a meeting.
9 Q.    Were you present for the meeting?
10 A.    No.
11 Q.    How did you find out about it?
12 A.    Just by one of -- I think it was Paul Nardozi
13 called me up after the meeting and just said that the
14 Councilmen there, they were going to get rid of you.
15 Q.    Do you know when that meeting took place?
16 A.    It was sometime in August, I believe.
17 Q.    August of 2005?
18 A.    Yes. I'm not sure of the exact date.
19 Q.    Your lawsuit was filed on August 11th of 2005.
20 A.    Yeah. It might have been sooner. It might
21 have been July.
22 Q.    Have you ever seen the meeting minutes for this
23 Borough Council meeting where this was discussed?
24 A.    No.
25 Q.    Did you speak with anyone other than Councilman

57

1 Nardozi about what was said at that meeting?
2 A.    I just called Rich Barth, the union president,
3 and asked him what was going on.
4 Q.    What did he say?
5 A.    He didn't know, but he said he would find out
6 and then that was it. I never heard back from him.
7 Q.    Did you call him back to ask him?
8 A.    I don't remember if I did or not.
9 Q.    Other than Mr. Nardozi, have you spoken to
10 anyone who was present at that meeting who --
11 A.    No.
12 Q.    -- confirmed what happened?
13 A.    No.
14 Q.    Is there any reason why you didn't follow up
15 with anyone else to confirm what happened and relied
16 solely on what Mr. Nardozi told you?
17         MS. POLLICK: Objection. Assumes facts
18 not into evidence and calls for speculation.
19 A.    I couldn't get in touch with anybody else. I
20 didn't see any of the other Councilmen.
21 Q.    Did you try to call them at home?
22 A.    No.
23 Q.    Did you try to go to their house?
24 A.    No.
25 Q.    Did you try and go to any other Borough Council

## TONY GARZELLA

58

1 meetings?
2 A.    No, but I mean Dunmore you usually run into
3 somebody, so --
4 Q.    Did you call Mr. Loftus, the borough manager?
5 A.    No.
6 Q.    Did you ask to see any of the meeting minutes?
7 A.    No.
8 Q.    Were you ever terminated?
9 A.    No.
10 Q.    Did they take a vote at that meeting?
11 A.    I don't know if they did or not.
12 Q.    Did they ever take any tangible action against
13 you?
14        MS. POLLICK: Objection. Calls for --
15 A.    No. It was stopped.
16 Q.    There was just a discussion at a meeting,
17 correct?
18        MS. POLLICK: Objection. Calls for
19 speculation.
20 A.    I don't know if there was a discussion or what
21 it was. I mean --
22 Q.    You have no idea what they did if anything?
23 A.    Well, I mean I'm just going by what I was told,
24 that I was going to be either terminated or fired, by
25 Councilman Nardozi.

59

1 Q.    Are you aware of any official action that was
2 taken by Borough Council to terminate you?
3        MS. POLLICK: Objection.
4 A.    No, I'm not aware.
5 Q.    How about after you filed your lawsuit, have
6 you found out what happened at that meeting?
7 A.    I just figured the attorney would find out and
8 we can find out through depositions exactly what
9 happened.
10 Q.    So the answer is no?
11 A.    No, I didn't.
12 Q.    As of today, you are still employed as a police
13 officer with the borough of Dunmore. Is that correct?
14 A.    Correct.
15 Q.    You have not been terminated?
16 A.    No.
17 Q.    After the test, were you suspended?
18 A.    No.
19 Q.    Were you disciplined in any way?
20 A.    No.
21 Q.    Did you have any e-mails or correspondence with
22 Mr. Nardozi about the situation at the borough?
23 A.    No.
24 Q.    When was the last time you spoke to Mr.
25 Nardozi?

60

1 A.    Three months ago maybe.
2 Q.    He's no longer on Borough Council. Is that
3 correct?
4 A.    Correct.
5 Q.    What did you talk to him about three months
6 ago?
7 A.    I don't remember really. It was nothing about
8 anything.
9 Q.    Have you ever talked to him about the lawsuit?
10 A.    Talked to him, no.
11 Q.    Did you tell him you were going to file a
12 lawsuit?
13 A.    Yes.
14 Q.    When did you tell him that?
15 A.    I think it was already filed when I told him
16 that I was filing.
17 Q.    So you did have another conversation with Mr.
18 Nardozi after the initial one where he told you about
19 what happened at that Borough Council meeting. Is that
20 correct?
21 A.    Correct.
22 Q.    This second conversation you had with Mr.
23 Nardozi, where did that take place?
24 A.    On the cell phones.
25 Q.    Who called who?

61

1 A.    I think he called me.
2 Q.    Do you know why?
3 A.    I can't remember why, no.
4 Q.    And what did you tell him about your lawsuit?
5 A.    Just that I had filed. It didn't actually come
6 out yet that it was out.
7 Q.    What did he say in response?
8 A.    He just said good, he said, because it's not
9 right what they did with the elements.
10 Q.    When he said it's not right what they did, do
11 you know who they is?
12 A.    They I assume would be the borough.
13 Q.    Who at the borough?
14 A.    I guess the Civil Service Commission, whoever
15 scores the test.
16 Q.    Did you have any conversations with any other
17 Borough Council members other than what you've already
18 testified to about the test or the scoring?
19 A.    Hum-um.
20 Q.    That's a no?
21 A.    No.
22 Q.    Did you ever follow up with Mr. Hennigan about
23 the test?
24 A.    No.
25 Q.    And did you ever talk to Mr. Loftus, the

TONY GARZELLA

62

1 borough manager, about the test?
2 A.    No.
3 Q.    Do you know whether Officer Cali spoke to any
4 Borough Council members after the test?
5         MS. POLLICK: Objection. Lack of
6 personal knowledge.
7 A.    I don't know.
8 Q.    Do you know whether Officer Cali spoke to Mr.
9 Loftus after the test?
10 A.    I don't know.
11         MS. POLLICK: Objection. Lack of
12 personal knowledge.
13 Q.    Do you know whether Officer Cali spoke to any
14 member on the Civil Service Commission after the test?
15         MS. POLLICK: Same objection.
16 A.    I don't know exactly who he talked to.
17 Q.    Before you took the civil service test, what
18 rank did you hold with the police department?
19 A.    Patrolman.
20 Q.    And within the DPA, under the collective
21 bargaining agreement, what was your position?
22 A.    Patrolman.
23 Q.    Were you a full-time officer or reserve
24 officer?
25 A.    I was full-time, but they called us reserve

63

1 officers.
2 Q.    So before you took the test you held the rank
3 of patrolman, correct?
4 A.    Correct.
5 Q.    And you were an active reserve officer,
6 correct?
7 A.    Correct.
8 Q.    After you took the test, what rank did you
9 hold?
10 A.    Patrolman.
11 Q.    And were you an active reserve officer after
12 you took the test?
13 A.    Yes.
14
15
16
17
18
19
20
21
22
23 Q.    So when you took the test, you were on patrol,
24 you were --
25 A.    Correct.

64

1 Q.    -- working a schedule?
2 A.    Yes.
3 Q.    After the test, the hours that you worked, were
4 they altered in any way?
5 A.    Not right after the test.  Maybe a month, six
6 weeks after.
7 Q.    And how were your hours altered?
8 A.    I was put on midnights.
9 Q.    How are shifts -- how are people assigned to a
10 shift?
11 A.    We bid by seniority.
12 Q.    And how was it that you went to midnights?
13 A.    Because I lost my seniority.
14 Q.    Under the collective bargaining agreement, it's
15 my understanding that full-time officers have seniority
16 over active reserve officers.  Is that correct?
17 A.    Correct.
18 Q.    And then within the classification of active
19 reserve officers, you can have seniority over other
20 active reserve officers.  Is that correct?
21 A.    Correct.
22 Q.    So as a result of remaining as an active
23 reserve officer and the other officers passing the test
24 and being promoted to full-time officer, the seniority,
25 they had higher seniority than you, correct?

65

1 A.    Um-hum.
2 Q.    That's a yes?
3 A.    Correct.
4 Q.    Other than having your shift change, did your
5 hours decrease, increase or did they stay the same?
6 A.    Stayed the same.
7 Q.    Do you have rotating shifts?
8 A.    No.  We bid shifts Monday day, like day shift 3
9 to 11 and midnights are steady.  They're steady shifts.
10 Q.    When you bid for a shift, how long is that bid
11 good for?
12 A.    One year.
13 Q.    So you're working the midnights -- so you would
14 work the midnight shift for that entire year, correct?
15 A.    For one year, yes.
16
17
18
19
20
21
22
23
24
25

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**TONY GARZELLA**

66

14 Q.    Did you file any grievance about the scoring
15 with the borough?
16 A.    Not with the borough, with the union.
17 Q.    Did you file any type of official complaint,
18 grievance, appeal, however you want to term it, with
19 the borough about the way the scoring was done?
20 A.    No.
21          MS. POLLICK: Objection. Assumes facts
22 not into evidence.
23 Q.    Now, you said you filed a grievance with the
24 union.  When did that take place?
25 A.    I think it was June.

67

1 Q.    June of '05?
2 A.    Yes.
3 Q.    Shortly after the test results came out?
4 A.    Yes.
5 Q.    How did you file the grievance?  What did you
6 physically have to do?
7 A.    Anthony Cali wrote the grievance up and we
8 just, Patrolman Sibio and I read it and we just -- he
9 filed it and I think the president of the union.
10 Q.    Do you know what happened to the grievance?
11 A.    No.
12 Q.    Did you ever follow up with the president of
13 the union to find out what happened?
14 A.    Yeah.  I asked him what was going on with it.
15 Q.    When?
16 A.    I couldn't tell you right offhand exactly when.
17 Q.    Was it within a couple of months?
18 A.    Yeah, maybe a couple months, a month.
19 Q.    Who did you talk to?
20 A.    Rich Barth.
21 Q.    What did he tell you?
22 A.    He said he didn't know, that I guess they were
23 in the process of talking to Attorney Jennings and
24 trying to get something figured out.
25 Q.    Did you follow up with Barth after that to find

68

1 out what happened with the grievance?
2 A.    I just kept asking him exactly what was going
3 on with it.
4 Q.    And what's your understanding of what happened
5 to the grievance?
6 A.    I don't think anything happened with the
7 grievance.
8 Q.    When was the last time you spoke to any
9 leadership in the union about your grievance?
10 A.    This --
11 Q.    The grievance about the test.
12 A.    In June.  Not in awhile.
13 Q.    Is there another grievance?
14 A.    There was another grievance filed.
15 Q.    By who?
16 A.    By myself and Anthony.
17 Q.    When did you file that one?
18 A.    When we had our seniority taken off us.
19 Q.    And who did you file that grievance with?
20 A.    With the union.
21 Q.    Do you know what happened to that grievance?
22 A.    The last time we had a grievance committee and
23 it was denied after a couple weeks after we sat for the
24 grievance committee.
25 Q.    When were you notified that it was denied?  Do

69

1 you remember what month?
2 A.    No, not really.  It might have been a month
3 after the meeting, but I'm not quite sure.
4 Q.    While you worked for the borough of Dunmore,
5 did you ever work for any other police department?
6 A.    No.
7 Q.    Did you ever look for a job at any other police
8 department?
9 A.    No.
10 Q.    Did you look for a job at another police
11 department before you started at Dunmore?
12 A.    No.
13 Q.    Where did you grow up?
14 A.    Dunmore.
15 Q.    During the tenure of your employment with the
16 borough, have you ever been disciplined for any reason?
17 A.    With the borough?
18 Q.    With the borough.
19 A.    No.
20 Q.    During your tenure with the borough, have you
21 always remained certified as a police officer?
22 A.    Yes.
23 Q.    Have you ever been arrested?
24 A.    No.
25 Q.    Did you work anywhere else after you graduated

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**TONY GARZELLA**

70

1 high school but before you started with the borough?
2 A.    I worked a couple jobs, yes.
3 Q.    What did you do before you started as a police
4 officer?
5 A.    I worked as a chef.
6 Q.    Where?
7 A.    Montage Mountain.
8 Q.    Anywhere else?
9 A.    Stadium Club.
10 Q.    As what type of job?
11 A.    Cooking, chef, manager.
12 Q.    Why did you become a police officer?
13 A.    I was always interested and when I was a kid my
14 dad was a policeman and I figured, you know, it was
15 something that I would want to do.
16 Q.    Who is Mike Lydon, do you know?
17 A.    Mike Lydon?
18 Q.    Yes.
19 A.    Yeah.
20 Q.    Who is that?
21 A.    He works with us, police officer.
22 Q.    Did you ever speak to Officer Lydon about the
23 civil service test or the scoring?
24 A.    Yeah, I believe I did.
25 Q.    When did you talk to him?

71

1 A.    I couldn't tell you exactly when I did.
2 Q.    Do you remember what you talked about with him?
3 A.    Hum-um.
4 Q.    Same sort of general stuff you would have
5 talked with the other police officers about?
6         MS. POLLICK: Objection. Assumes facts
7 not into evidence, calls for speculation.
8 A.    Yeah, as far as I know.
9 Q.    Did you ever have any -- do you know whether
10 Officer Cali ever spoke with Joe Loftus about the civil
11 service test or the way it was scored?
12 A.    I don't know if he did or not, no.
13 Q.    Did you have any conversations with Officer
14 Cali about any statements that Mr. Loftus may have made
15 about the police department, finances in general,
16 anything like that?
17 A.    No.
18 Q.    Did you ever talk with anybody at the PA Chiefs
19 about the civil service exam?
20 A.    No.
21 Q.    Do you know whether Officer Cali did?
22 A.    I don't know if they did or not.
23 Q.    Did you ever contact either through e-mail or
24 written like letter to anybody at the PA Chiefs about
25 the civil service exam?

72

1 A.    Myself?
2 Q.    Yes.
3 A.    No.
4 Q.    Do you know whether Officer Cali did?
5 A.    I don't know if he did or not.
6 Q.    Did you contact or discuss the test with
7 anybody at Standard and Associates, the ones who
8 provided the test?
9 A.    No.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

TONY GARZELLA

74                                                                          76

3   Q.      Have you had any conversation with any current
4   Borough Council member about this lawsuit?
5   A.      No.
6   Q.      Have you had any conversation with any prior
7   Council members about this lawsuit?
8   A.      No.
9   Q.      Have you had any conversations with Mr. Loftus
10  about the lawsuit?
11  A.      No.
12  Q.      Any conversations with the borough solicitor,
13  Mr. Cummings?
14  A.      No.
15  Q.      Have you had any conversations with Mr.
16  O'Neill, the Civil Service Commission solicitor, about
17  the lawsuit?
18  A.      No.
19          MR. GONZALES:  That's all the questions
20  I have.  I may have some follow-up questions, but I'm
21  sure the other attorneys will have some questions for
22  you.
23                      * * *
24          EXAMINATION
25  BY MR. HOLROYD:

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

## TONY GARZELLA

78

1  Q.    Good morning, officer.  I don't know if we ever
2  met before, but my name is Steve Holroyd.  I represent
3  Dunmore Police Association in this matter.  And I have
4  a few questions for you.  I don't expect to take as
5  long as Mr. Gonzales did.
6          I would ask that the same instructions
7  he gave you, that you just keep them in mind when I'm
8  asking you questions.
9          For starters, you are employed by the
10 borough of Dunmore Police Department?
11 A.    Correct.
12 Q.    You're not employed by the Dunmore Police
13 Association?
14 A.    Correct.
15 Q.    The Dunmore Police Association, that's your
16 union?
17 A.    Correct.
18 Q.    How long have you been in the union?
19 A.    I would say it has to be at least ten years
20 now.  I don't know exactly.  I think it was 1996 we got
21 put in the union.  I'm not sure.
22 Q.    Have you ever held union office?
23 A.    No.
24 Q.    Have you ever run for union office?
25 A.    No.

79

1  Q.    Did you ever campaign for or against anyone in
2  a union election?
3  A.    Not openly, no.
4  Q.    Other than the grievance regarding the test and
5  I think the grievance you told us about your seniority,
6  have you ever filed any other grievances with the
7  union?
8  A.    Just one grievance that there wasn't enough
9  information on it and they sent it back and they said I
10 had to do it over.
11 Q.    And what grievance was that?
12 A.    I had to put more information on it.  It was
13 the one about seniority.
14 Q.    When was that filed with the union?
15 A.    I believe it was August, I'm not sure though.
16 Q.    2005?
17 A.    Yeah.
18 Q.    And the union's response was they needed more
19 information?
20 A.    To make it more factual, I believe they used
21 the term.
22 Q.    Did you do that?
23 A.    Yes.
24 Q.    And did you refile the grievance?
25 A.    Yes.

80

1  Q.    Any other grievances?
2  A.    Just that's it.  No.
3  Q.    Now, the arbitration award came out in February
4  of 2005, correct?
5  A.    Correct.
6  Q.    Prior to that award coming out, do you recall
7  whether there were union meetings discussing the
8  possibility of settling the contract prior to the award
9  coming out?
10 A.    Yes, there was.
11 Q.    Did you attend those meetings?
12 A.    Yes.
13 Q.    Approximately how many meetings were there?
14 A.    I couldn't say offhand.
15 Q.    At those meetings, was the possibility of a
16 civil service test addressed?
17 A.    Yeah.  They said if we went to arbitration
18 there would be a good chance that we'd possibly be
19 taking a civil service test.
20 Q.    During those meetings, was any union member in
21 particular advocating settling the contract prior to an
22 award coming out?
23          MS. POLLICK:  Objection.  Calls for
24 speculation.
25 A.    Patrolman Springer was vocal on settling it.

81

1  Q.    When Patrolman Springer was being vocal about
2  settling, did he address the test at all?
3  A.    That there would be a possibility if we went to
4  arbitration that they would give us a test.
5  Q.    Was Patrolman Springer concerned about the
6  test?
7  A.    Yes, I believe he was.
8  Q.    Did he indicate whether or not he wanted to
9  take a test?
10 A.    I don't remember, but I don't think he would
11 take the test -- I think he might have said he didn't
12 want to take a test.
13 Q.    Now, while Patrolman Springer was talking about
14 the possibility of settling, were there any police
15 officers who were adamant against settling and wanting
16 to get an award?
17 A.    The majority of them were.
18 Q.    And was Officer Cali in that majority?
19 A.    Yes.
20 Q.    Now, after the decision came out, how long
21 after the decision came out was the test scheduled?
22 A.    The award came back I guess sometime in
23 February and I think the test was scheduled for the
24 22nd of May.
25 Q.    And I guess the better question would have been

**TONY GARZELLA**

82

1 when were police officers advised that the test was
2 scheduled for May?
3 A.    Maybe six weeks after the award came back.  I'm
4 not sure exactly.
5 Q.    After the award came out, was there a union
6 meeting to discuss whether to appeal the award?
7 A.    I believe there was, yes.
8 Q.    Did you attend that meeting?
9 A.    I think I did, yes.
10 Q.    And at that meeting, did the union membership
11 vote not to appeal the award?
12 A.    Correct.
13 Q.    Do you recall what the vote was?
14 A.    No.
15 Q.    After the test was scheduled, did some officers
16 continue to express concerns about their ability to
17 take the test?
18 A.    Yes.
19 Q.    Which officers had expressed concerns about
20 their ability to take the test?
21 A.    Quite a few of them expressed themselves.
22 Q.    Can you remember who?
23 A.    Myself, Anthony, I know Rich Barth was
24 concerned, you know.  The majority of the guys were
25 concerned.

83

1 Q.    Was there an Officer Reynolds?
2 A.    Reynolds.
3 Q.    Now, did any officers offer to tutor other
4 officers in preparing for this test?
5 A.    Yes.
6 Q.    And which officers offered to do that?
7 A.    Officer Springer.
8 Q.    And at this time was there something called a
9 police update class going on?
10 A.    Yes.
11 Q.    And what is that exactly?
12 A.    You go for your updates, your mandatory updates
13 that are required by the state.
14 Q.    And at the time were you participating in the
15 updates?
16 A.    Yes.
17 Q.    Was Patrolman Springer offering to prep people
18 after these updates were done?
19 A.    Um-hum.
20 Q.    And did he prep Officer Reynolds?
21 A.    Yes.
22 Q.    And did he prep you?
23 A.    Yes.
24 Q.    How many times did he prep with you?
25 A.    I did it once, that one time.

84

1 Q.    Now, did he offer to continue to prep you?
2 A.    Yes.
3 Q.    But you didn't take him up on that offer?
4 A.    We just never could get together.
5 Q.    Were also prep sessions being done through your
6 lunch break on your regular shifts, during police
7 officers' lunch breaks?
8          MS. POLLICK:  Objection.
9 Q.    Let me rephrase that.  Do you know whether
10 there were also prep sessions being done during the
11 lunch shifts, lunch breaks?
12          MS. POLLICK:  Objection.  Calls for
13 speculation.
14 A.    I don't know.
15 Q.    In your complaint, officer, you make a number
16 of allegations that I wanted to explore with you.  At
17 paragraph 18 --
18          MS. POLLICK:  I'm just going to object
19 to the fact that you're not giving him a copy of the
20 complaint and you're referring to a paragraph.
21          MR. HOLROYD:  Let's go off the record.
22          (Discussion off the record.)
23 BY MR. HOLROYD:
24 Q.    Officer, you've been handed what's been marked
25 as Garzella Exhibit 3.  Let me direct your attention to

85

1 page 5 of that complaint.  Let me direct your attention
2 to paragraph 18.  There you allege defendants in
3 recognition of your years of service failed to promote
4 slash in effect demoted you in or around June 2005.
5 Which defendants were you referring to?
6 A.    I believe the borough.
7 Q.    The borough.  It's not your contention that the
8 Dunmore Police Association failed to promote you or in
9 effect demoted you?
10 A.    Right.
11 Q.    Similarly, at paragraph 19, where you allege
12 you received a passing score but defendants had failed
13 to promote you, what defendants are you referring to
14 there?
15 A.    The borough.
16 Q.    You're not alleging that the Dunmore Police
17 Association failed to promote you?
18 A.    Correct.
19 Q.    Similarly at paragraph 20, where again you
20 allege defendants demoted you, that's referring to the
21 borough?
22 A.    Correct.
23 Q.    You're not referring to the DPA's having
24 demoted you.  Is that correct?
25 A.    Correct.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

86

1  Q.      Paragraph 22 where you allege defendants never
2  gave Officer Garzella oral or written notice of the
3  charges against him or opportunity to respond to the
4  charges, you're referring to the borough?
5  A.      Correct.
6  Q.      You're not alleging that the Dunmore Police
7  Association never gave you written notice of charges
8  against you?
9  A.      Correct.
10 Q.      Paragraph 23, which is the next page, you
11 allege defendants never provided Officer Garzella with
12 a pre-failure to promote/demotion hearing or any
13 post-failure to promote/demotion hearing as required by
14 law. Again, the defendants you're referring to there
15 is the borough?
16 A.      Correct.
17 Q.      You're not alleging that the Dunmore Police
18 Association failed to provide you with any hearing?
19       MS. POLLICK: Objection. Assumes facts
20 not into evidence.
21 A.      Correct.

23 defendants had intentionally failed to provide Officer
24 Garzella with any hearing on those charges, the
25 defendants you're referring to there is the borough of

87

1  Dunmore?
2  A.      (Witness nods head)
3  Q.      You're not alleging that the Dunmore Police
4  Association failed to provide you with any hearing or
5  notice of charges?
6        MS. POLLICK: Objection. Assumes facts
7  not in evidence.
8  A.      No.
9  Q.      No, it's not correct, or no, you're not
10 alleging the DPA has failed to provide you with a
11 hearing?
12 A.      Not alleging.
13 Q.      At paragraph 27, you allege that the defendant
14 Dunmore Police Association has discriminatorily,
15 arbitrarily and in bad faith refused to represent you
16 in connection with your grievances. What evidence do
17 you have to support that contention?
18 A.      Just the grievance that we filed.
19 Q.      And which grievance would that be?
20 A.      The first one.
21 Q.      That's the grievance involving the test?
22 A.      Or the scoring.
23 Q.      The scoring of the test?
24 A.      Um-hum.
25 Q.      This is a grievance that was filed in about

88

1  June of 2005?
2  A.      I believe so, yes.
3  Q.      Now, prior, if I understood you correctly,
4  Anthony Cali filed that grievance on your behalf and
5  his and Jody's behalf?
6  A.      Correct.
7  Q.      Prior to his filing that grievance was there a
8  union meeting where the issue of the scoring of the
9  test was discussed?
10 A.      I believe there was, yes.
11 Q.      And during that meeting was a vote taken
12 regarding whether or not to proceed with that
13 grievance?
14 A.      Yes, there was.
15 Q.      And the vote --
16 A.      Go ahead.
17 Q.      I'm sorry. And the vote was the membership
18 voted not to proceed with the grievance. Is that
19 correct?
20 A.      Correct.
21 Q.      And the vote was 18 to 3?

23 Q.      And the three votes to proceed with the
24 grievance were your vote, Officer Cali's vote and
25 Officer Sibio's vote?

89

1  A.      Correct.
2  Q.      But after that meeting Officer Cali filed his
3  grievance anyway?
4  A.      He filed it over the scoring of the test.
5  Q.      But was that the same issue that was decided by
6  the membership prior to his filing the grievance?
7  A.      No. The first grievance was over the whole
8  test itself.
9  Q.      So the second grievance was over the scoring of
10 the test?
11       MS. POLLICK: Objection. Assumes facts
12 not into evidence and confusing.
13 A.      Correct.
14 Q.      So what was discriminatory, arbitrary or in bad
15 faith involving as far as the DPA's processing of that
16 grievance?
17       MS. POLLICK: Objection. Vague
18 question.
19 A.      Which one now?
20 Q.      The grievance about the scoring of the test.
21 A.      Because they didn't do anything with us. It's
22 so obvious what occurred.
23 Q.      Did anyone from the union ever advise you why
24 they were not proceeding with that grievance?
25 A.      Yes.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

90

1 Q. Who?

2 A. We had a phone conversation with Tom Jennings.

3 Q. Who was present on that phone conversation?

4 A. Billy Springer, myself, Anthony Cali and that's

5 it, I think, just the four of us.

6 Q. What was discussed during that call?

7 A. I don't know if the grievance was -- that

8 grievance was discussed, but Attorney Jennings told us,

9 he said that we didn't pass the elements and we failed

10 the test. Basically just we failed the test and there

11 was nothing that he can do. And that the best thing

12 that we could do is probably just negotiate a test for

13 ourselves to take.

14 Q. A second test?

15        MS. POLLICK: Objection. Assumes facts

16 not into evidence.

17 A. To take a second test.

18 Q. Any other conversations with union officials

19 regarding that grievance?

20 A. None that I know of, no.

21 Q. Did anyone from the union ever tell you that

22 they were refusing to process this grievance because of

23 anything you had done?

24 A. No, nobody told me.

25 Q. Do you have any other evidence to support your

91

1 contention that the failure to process this grievance

2 was discriminatory, arbitrary or in bad faith?

3        MS. POLLICK: Objection. Calls for a

4 legal conclusion.

5 A. No, not here with me now.

6 Q. At paragraph 28 you allege that the DPA allowed

7 you to be harassed, publicly humiliated and demoted.

8 What evidence do you have to support that allegation?

9 A. They're the ones that demoted me. I mean they

10 took my seniority off me originally.

11 Q. The DPA?

12 A. Yes.

13 Q. I'm sorry. The DPA took your seniority off

14 you?

15 A. Yes.

16 Q. And how did they do that?

17 A. They wrote a letter saying that we're going to

18 lose our seniority and they said they made up the new

19 seniority list and they sent it over to the borough,

20 that it was going to be done. I guess they gave them a

21 certain amount of time to contest it and it wasn't

22 contested and I lost my seniority.

23 Q. This was the seniority list that was prepared

24 after the test results had come in?

25 A. Right.

92

1 Q. And so this was the seniority list that had

2 full-time police officers ranked ahead of reserve

3 police officers?

4 A. Correct.

5 Q. Do you have any other evidence supporting the

6 allegation that the DPA harassed and publicly

7 humiliated you?

8 A. Yeah, because just out in public, I mean people

9 would say to me, you know, you failed the test. And

10 the rumor going around was that I failed the test and I

11 actually passed the test. So it was kind of hard to --

12 I mean if they did what they were supposed to do and

13 they looked at all the facts, they'd see that I

14 actually passed the test.

15 Q. When you say people, what people come up to

16 you?

17 A. Just people in general, like.

18 Q. Such as who, other police officers?

19 A. No, like people if I walk into a store or

20 something, people in there, I had it at least two or

21 three times.

22 Q. Can you recall those two or three times for me?

23 A. Once at the smoke shop, the kid behind the

24 counter asked me if I -- something about a test, he

25 said you have to take a civil service test and you

93

1 failed it and this and that, just going on and on. I

2 was like I didn't fail the test, you know. I passed

3 the test.

4 Q. Do you remember the kid's name?

5 A. I know his first name is -- I think it's Craig.

6 I wouldn't be able to tell you what his last name is.

7 Q. And approximately when did that conversation

8 take place?

9 A. This was a few months ago. This is back

10 towards probably December.

11 Q. What other occasions can you recall?

12 A. The owner of Sal's restaurant, Sal Ganari, had

13 mentioned it to me. He said that -- he said he was

14 happy that some guys failed the test that he didn't

15 like, but he said he felt bad for me because he said

16 that I failed the test. So I mean that was -- I had

17 explained to him that I didn't fail the test, I

18 actually passed the test.

19        And once at a party, I went to another

20 guy, same conversation over I think it was right around

21 the time when the lawsuit was filed. And he was

22 saying, you know, about me failing the test. And I

23 just felt like a jerk, you know what I mean, because I

24 actually didn't fail the test, I passed the test.

25 Q. Who was it that third time, do you remember

24 (Pages 90 to 93)

## TONY GARZELLA

94

1 that person's name?
2 A.    His last name is Bistran and there's quite a
3 bit of family and I'd be able to find out his first
4 name when I saw him.  But his last name is Bistran.
5 Q.    Any other evidence to support your allegation
6 that the DPA allowed you to be harassed and publicly
7 humiliated?
8 A.    No.
9 Q.    Paragraph 31, you allege that the borough of
10 Dunmore and union representative Rich Barth and union
11 representative William Springer were conspiring to
12 deprive you of your constitutional rights.  What
13 evidence do you have to support your contention that
14 there was a conspiracy to deprive you of your rights?
15        MS. POLLICK:  Objection.  Calls for a
16 legal conclusion.
17 A.    The evidence would be just me being in the
18 situation that I'm in after I pass the test the way I
19 was supposed to pass it, and then everything else just
20 passed me out.
21 Q.    Do you have any evidence that the DPA -- let me
22 withdraw that and ask this.
23        Who administered the civil service test?
24 A.    Civil Service Commission.
25 Q.    Did the DPA have any involvement with the

95

1 administering of that test?
2 A.    No.
3        MS. POLLICK:  Objection.  Calls for
4 speculation.
5 Q.    Do you know whether the DPA had any hand in
6 scoring the test?
7        MS. POLLICK:  Objection.  Calls for
8 speculation.
9 A.    No.
10 Q.    No, you don't know, or no, they didn't?
11 A.    Did not.
12 Q.    Do you know whether any representatives of the
13 DPA ever met with a member of Borough Council to
14 discuss the civil service test?
15 A.    I don't know of any.
16        MS. POLLICK:  Objection.  Calls for
17 speculation.
18 A.    I don't know of any.
19 Q.    At paragraph 39 of your complaint, page 9, you
20 allege that the DPA has publicly criticized and
21 admonished its members from discussing the civil
22 service test requirement with agents and employees of
23 the borough of Dunmore.  What evidence do you have to
24 support that section?
25 A.    They stuck a thing up on the board.  I remember

96

1 reading it.  That if anybody was caught talking to
2 anybody they would take disciplinary action against us,
3 the union members.
4 Q.    This is the union posted it?
5 A.    Yes.
6 Q.    It was on the union's board?
7 A.    Yes.
8 Q.    Did you read that notice?
9 A.    Yes.
10 Q.    Did you know to what it was referring?
11 A.    I believe it was referring to myself and
12 Anthony Cali going and talking to Hennigan.
13 Q.    And I think you told us at the time of that
14 meeting you were not on the negotiating committee?
15 A.    No, I was not.
16 Q.    After the award had come out in February, did
17 the negotiating committee continue to exist?
18        MS. POLLICK:  Objection.  Calls for
19 speculation, lack of personal knowledge.
20 A.    I don't know.  I believe it did.  I don't know.
21 Q.    What else did the DPA do to publicly criticize
22 or admonish you regarding discussing the civil service
23 test?
24 A.    Nothing.  That's it.
25 Q.    That's it.  In paragraph 40 you allege that the

97

1 DPA has given false information about the scoring of
2 the civil service test.  What evidence do you have in
3 support of that?
4 A.    A letter that stated that all we needed was I
5 believe how many questions were going to be on the test
6 and that 70 was the passing score of the test.
7 Q.    Is this a letter that the DPA put out?
8 A.    Yes.
9 Q.    And do you know from where the DPA got the
10 information regarding that?
11 A.    From the Civil Service Commission.
12        MS. POLLICK:  Objection.  Calls for
13 speculation.
14 Q.    The May meeting that you and Officer Cali had
15 with Hennigan, you testified that it was initially
16 supposed to be Officers Cali and Bonavoglia going to a
17 meeting?
18 A.    Bonavoglia, yeah.
19 Q.    Officer Bonavoglia was president of the DPA
20 prior to Officer Barth becoming president?
21 A.    Correct.
22 Q.    And Officer Cali was secretary-treasurer of the
23 DPA prior to Officer Springer?
24 A.    Correct.
25 Q.    You were telling us in preparation for the test

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

98

1  you received a study guide at one point?
2  A.    Yes.
3  Q.    When did you receive that study guide?
4  A.    I don't know if it was -- it was probably six
5  or eight days before the test maybe.  I'm not exactly
6  sure.
7  Q.    From whom did you receive the study guide?
8  A.    From the borough, from I guess the person, the
9  people that were giving the test.
10              MR. HOLROYD:  That's all I have, thank
11 you.
12              MR. GONZALES:  I have some follow-up
13 unless your counsel has questions.
14              MS. POLLICK:  Why don't you follow up,
15 I'll go last.
16                    * * *
17              RE-EXAMINATION
18 BY MR. GONZALES:
19 Q.    Did you ever file a grievance with the borough
20 about the way the test was scored?
21              MS. POLLICK:  Objection.  Assumes facts
22 not into evidence.
23              MR. GONZALES:  I don't know what that
24 means.
25 Q.    Did you file a request for a hearing with the

99

1  Civil Service Commission to appeal the scoring of the
2  test?
3  A.    No.
4  Q.    The only grievance that you filed was the
5  grievance you filed with the union, correct?
6  A.    Correct.
7  Q.    Do you know whether Officer Cali filed a
8  grievance with the borough about the test scoring?
9  A.    I don't know.
10 Q.    Do you know whether Officer Cali requested a
11 hearing before the Civil Service Commission to appeal
12 the scoring for the civil service test?
13 A.    I don't know.
14              MR. GONZALES:  Give me a minute.  I just
15 want to make a couple of copies so I have copies of
16 exhibits for everyone, unless you want to go ahead and
17 question him.
18              MS. POLLICK:  Go ahead.
19              (Short recess.)
20 BY MR. GONZALES:
21 Q.    Do you remember I had asked you previously
22 about a conversation you had with Councilman Burke and
23 do you recall anything else that Mr. Burke told you
24 during your conversation with him?
25 A.    On --

100

1  Q.    Other than what you've already testified to
2  about the test, about the civil service examination.
3  A.    Not that I can remember.
4  Q.    I'm going to show you a document which we will
5  mark as Garzella 4.
6  A.    Yeah, I remember.  This is going way back.
7  Q.    That's why I'm showing it to you.  This is
8  things that happened a year ago, two years ago.
9  Sometimes looking at a document can jog your memory.
10              Garzella 4 appears to be an e-mail from
11 -- is that from you?
12 A.    Correct, yes.
13 Q.    Your e-mail address is GARZ84?
14 A.    Correct.
15 Q.    And it is to I believe Anthony Cali.  Is that
16 correct?
17 A.    Correct.
18 Q.    His e-mail address is ANTH311?
19 A.    Correct.
20 Q.    Now, this e-mail references a March 12th, 2005,
21 conversation you had with Councilman Burke.  Is that
22 correct?
23 A.    Correct.
24 Q.    I notice that the date of this e-mail is --
25 what is the date on this e-mail?

101

1  A.    7-4.
2  Q.    So that's July 4th, 2005, correct?
3  A.    Correct.
4  Q.    So the e-mail is several months after you had
5  the conversation with Mr. Burke.  Is that correct?
6  A.    Correct.
7  Q.    Now, your e-mail says, quote, he started the
8  conversation off, he meaning Councilman Burke, by
9  telling me I better study for the civil service test
10 the borough was going to give and the test will be
11 given before June 20th.  Do you remember Mr. Burke
12 telling you that?
13 A.    Correct.
14 Q.    Do you remember that independently of reading
15 it in this document or the only way you remember it is
16 because it was written down here?
17 A.    I remember when he was telling me.
18 Q.    Next sentence says also if anyone failed the
19 test they will be fired.  Do you remember Mr. Burke
20 telling you that?
21 A.    Yes.
22 Q.    Now, the next sentence says the test will not
23 be easy and will be only for good test takers.
24 A.    Correct.
25 Q.    Do you remember him telling you that?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

102

1  A.    Yes.
2  Q.    Next it said he said this was coming from
3  Councilman Cummings and Hennigan.
4  A.    Correct.
5  Q.    Do you remember him telling you that?
6  A.    Yes.
7  Q.    Then it said he said they were trying to get
8  their own people in there.  Do you remember that?
9  A.    Correct.  Yes.
10  Q.    Now, you're telling -- it's your testimony that
11  Councilman Burke told you all of these things in March
12  of 2005 before you took the exam.  Is that correct?
13  A.    Correct.
14  Q.    Did you ever file a grievance, notify the
15  borough or anyone that Mr. Burke had made those
16  statements to you?
17       MS. POLLICK:  Objection.  Compound
18  question.
19  Q.    I'll break it down for you.
20  A.    I went to the union --
21  Q.    Let me break it down.  Your attorney has made
22  an objection and I'm going to break the question down.
23  Her objection is it's compound because I asked you more
24  than one thing in one question.  I'll break it down.
25       Did you notify anybody at the borough

103

1  that Mr. Burke had told you that?
2  A.    No.
3  Q.    Did you file a grievance with anyone at the
4  borough that Mr. Burke had said those things?
5  A.    No.
6  Q.    Did you contact anyone in the union about that
7  conversation --
8  A.    Yes.
9  Q.    Wait until I finish asking the question.
10  A.    Sorry.
11  Q.    Did you contact anyone in the borough about
12  that conversation with -- strike that.
13       Did you notify anybody in the union
14  about that conversation with Mr. Burke?
15  A.    Yes.
16  Q.    Who did you notify?
17  A.    Officer Springer.
18  Q.    When?
19  A.    Right around the time that he said it.
20  Q.    Sometime in March of '05?
21  A.    March, yes, correct.
22  Q.    What did you say to him?
23  A.    Just that Burkey said that whoever didn't pass
24  the test is going to get fired.
25  Q.    Did you tell him anything else?

104

1  A.    Just when I made this, this is my note to know
2  what occurred.
3  Q.    Well, this note was written three or four
4  months after you had that conversation.  Did you write
5  any notes about that conversation before July 4th,
6  2005?
7  A.    No.  This has been in there for -- just because
8  the date is there doesn't mean that it was -- because
9  what I did is I added the bottom part on to it, so it
10  changed the whole thing.
11  Q.    I don't understand your answer.
12  A.    I'll have the original, I should have the
13  original one where you're saying the date is different
14  here, than what is here.  Right after I spoke to him I
15  noted this.
16  Q.    Where did you note it?
17  A.    In my computer.
18  Q.    Do you still have the same computer that you
19  had at the time?
20  A.    Yeah.
21  Q.    How did you note it?  You wrote --
22  A.    I just wrote it.
23  Q.    You just typed it in your computer?
24  A.    Yeah.
25  Q.    Did you e-mail that note to anybody at the time

105

1  that you wrote it?
2  A.    I think I sent it to Anthony.
3  Q.    When did you e-mail that notice to Anthony
4  originally?
5  A.    Probably maybe one or two days after it was
6  written.
7  Q.    Who's your e-mail account with at the time?
8  A.    AOL.
9  Q.    And your e-mail address was GARZ84@AOL.com?
10  A.    Correct.
11  Q.    Is there any reason why the only hard copy that
12  you produced through your attorney is the one dated
13  July 4th, 2005, and not the earlier one?
14  A.    No.  I'd have to check.
15  Q.    Do you have an earlier -- but it's your
16  testimony today that you sent this note to Officer Cali
17  sometime in March of 2005.  Is that correct?
18  A.    Yes.
19  Q.    I'm going to request that you produce the copy
20  of the document that's date stamped from March of 2005
21  and provide that to your attorney and I'll follow up
22  with her.
23       Did you forward that e-mail to anybody
24  in the union other than Officer Cali?
25  A.    I don't think so, no.

## ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

## TONY GARZELLA

106

1 Q.     Did you tell anyone other than -- I'm sorry.
2 Who did you say at the union you talked to?
3 A.     I told Officer Springer about it.
4 Q.     Did you ever tell anyone other than Officer
5 Springer or Officer Barth or Officer Cali about the
6 conversation you had with Mr. Burke?
7 A.     Officer Barth too, the president Barth.
8 Q.     When did you tell him?
9 A.     Probably the day right after it happened.
10 Q.    Did you forward the e-mail to him?
11 A.    I verbally told him.
12 Q.    And did you sue Councilman Burke?
13 A.    No.
14 Q.    Why not?
15 A.    Because he was one of the guys when they were
16 going to fire me that he stuck up for us and he stuck
17 up for us because he said, you know, you can't fire
18 these guys.
19 Q.    Do you have any knowledge that either
20 Councilman Cummings or Councilman Hennigan had any role
21 in determining the test company that would be used by
22 the borough?
23        MS. POLLICK: Objection. Lack of
24 personal knowledge. Calls for speculation.
25 A.    Do I know of any?

107

1 Q.     Yes.
2 A.     Not that I know of, no.
3 Q.     To your knowledge, they played no role in
4 determining who would be administering the test. Is
5 that correct?
6        MS. POLLICK: Objection. Calls for
7 speculation.
8 A.     Correct.
9        MR. GONZALES: We'll mark this as
10 Garzella 5.
11        MS. POLLICK: May I have a copy, please?
12        MR. GONZALES: I'm sorry.
13 Q.    I'm showing you a document which is marked as
14 Garzella 5. This may be the e-mail you were referring
15 to earlier, I'm not sure. It's dated March 13, 2005.
16 This is from you to Anthony Cali, correct?
17 A.    Correct.
18 Q.    Take a minute to read through it and let me
19 know when you're done. Have you had a chance to review
20 the e-mail?
21 A.    Yes.
22 Q.    This says beginning at the second sentence that
23 I was recently approached by a Councilman. What
24 Councilman are you referring to?
25 A.    Councilman Burke, I believe.

108

1 Q.     It says I was told the civil service test will
2 be given before June 20th.
3 A.     Correct.
4 Q.     Was that significant that it would be before
5 June 20th?
6 A.     No. I think it was just letting us know that
7 it was going to be given.
8 Q.     Is there a reason why you put before in all
9 capitals?
10 A.    Just so it would stand out.
11 Q.    Was there any discussion that it was -- with
12 the rank and file that it was originally supposed to
13 take place after June 20th?
14 A.    I guess that was the deadline on the
15 arbitration award.
16 Q.    Did you think that getting the test before June
17 20th, that that was a problem in any way or unfair?
18 A.    No.
19 Q.    Next sentence, if any officer fails the test
20 they will be fired. Again, this is from Councilman
21 Burke. Is that correct?
22 A.    Correct.
23 Q.    Next sentence, the test will not be easy and
24 will be designed for only a few chosen good test takers
25 to pass. Who told you that?

109

1 A.     That's coming from him.
2 Q.     Councilman Burke?
3 A.     Yeah. He said that the good test takers will
4 pass the test.
5 Q.     Now, do you have an independent recollection of
6 him saying that or is that just something that you
7 remember from reading this document?
8 A.     I remember him saying it.
9 Q.     Do you know how -- strike that.
10       The next sentence says this will make
11 openings for jobs that were promised out already to
12 other people. Who told you that?
13 A.    I guess the guys in general talking.
14 Q.    Did Mr. Burke tell you that?
15 A.    He might have, yeah. I believe he might have.
16 Q.    I don't want you to guess. If you remember him
17 saying that, tell me. If you don't, then tell me you
18 don't remember.
19 A.    I think he did.
20 Q.    Since this test, have any new police officers
21 been hired?
22 A.    No.
23 Q.    Have you learned since then that there were
24 jobs promised to -- jobs in the police department
25 promised to other people?

## ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

## TONY GARZELLA

110

1  A.    Not that I know of, no.
2  Q.    Next sentence, they seem to know already who
3  will pass the test and who will fail.  Is that
4  something Mr. Burke told you or is that your thoughts?
5  A.    That's my thoughts.
6  Q.    When you refer to they, who are you referring
7  to?
8  A.    Probably Council.
9  Q.    Next it says he also said that he was surprised
10 that our attorney agreed to this contract as he is
11 supposed to be the best attorney.
12 A.    Correct.
13 Q.    What attorney are you referring to?
14 A.    Attorney Jennings.
15 Q.    And what agreement are you referring to?
16 A.    The arbitration award, I guess, where we had to
17 take the test and stuff.
18 Q.    Was it your understanding that the arbitration
19 award was an agreed-to award or an award that was
20 decided by the arbitration panel?
21 A.    I mean I know it's an arbitration.  An
22 arbitrator has the final say, so that would come from
23 the arbitrator.
24 Q.    The arbitrator says it is so, it has to be so.
25 Isn't that correct?

111

1  A.    Correct.
2  Q.    Whether the union representative agrees or
3  disagrees?
4        MS. POLLICK:  Objection.  Calls for
5  speculation, lack of personal knowledge.
6  A.    Um-hum.
7  Q.    Same with the borough, you understand if the
8  borough agrees or disagrees, it really doesn't matter?
9        MS. POLLICK:  Same objections.
10 A.    Um-hum.
11 Q.    Is that a yes?  I didn't hear you.  Was it a
12 yes or no?
13 A.    Yes.
14 Q.    Next sentence, I told him that if this is the
15 case, we will probably sue the borough.  Who was the I?
16 A.    Probably the union.
17 Q.    It says I told him.  You're referring to you
18 yourself?
19 A.    Um-hum.
20 Q.    I told him, him meaning Councilman Burke?
21 A.    Correct.
22        MS. POLLICK:  Objection.  The document
23 speaks for itself.
24 Q.    Now, when you say we will probably sue the
25 borough, who are you referring to?

112

1  A.    Just anybody that would be hurt by it.
2  Q.    You were not contemplating just you and Mr.
3  Cali suing the borough at that time, correct?
4  A.    No.
5  Q.    What did you want to sue the borough over at
6  that time?
7  A.    Nothing right at that point, but just if we had
8  to, you know what I mean.  If they were going to get
9  rid of guys that had jobs for over ten years, I mean a
10 lawsuit's going to be filed.
11 Q.    Had you ever filed a lawsuit before?
12 A.    I haven't, no.
13 Q.    Whether it's police-related or personal, you've
14 never filed a lawsuit before?
15 A.    My parents filed a lawsuit on my behalf a long
16 time ago.  I was a minor.
17 Q.    Was it like an accident or something?
18 A.    No.  I walked into a shoe store with a seven or
19 eight day pair of sneakers on with one of my friends
20 and they accused me of stealing them.  They said you
21 stole the shoes.  I didn't steal the shoes.  I have the
22 receipt to show you.  My parents did.
23 Q.    Have you ever been sued before?
24 A.    No.
25 Q.    Next sentence, he said that we should have sued

113

1  the borough a long time ago for these jobs.
2  A.    Correct.
3  Q.    Is that Mr. Burke telling you that?
4  A.    Correct.
5  Q.    What did you say when he told you that?
6  A.    There's a long history of our situation with
7  being active reserve officers and part-time officers
8  working full-time hours.  So everybody knows this
9  situation.
10 Q.    So it was your understanding that he said you
11 should have sued the borough to become full-time
12 officers a long time ago?
13 A.    Full-time years ago.
14 Q.    Now, next sentence, at this time I will not
15 name the Councilman who told me this because he is on
16 our side.
17        MS. POLLICK:  Objection.  It says I
18 think.  You're not quoting the exact sentence as is.
19 Q.    You're right.  There's a comma, then I think.
20 Why is it that you believed he was on your side?
21 A.    Just because he was always supportive of the
22 police department and its officers.
23 Q.    Next sentence, however, our union
24 representatives will be told who it is and one of them
25 already knows.

## TONY GARZELLA

114

1  A.    Right.

2  Q.    Who already knew?

3  A.    Billy Springer.  It was either Billy or Rich

4  Barth, I'm not sure.

5  Q.    Next document we marked as Garzella 6.  Take

6  your time and take a look through that.

7          MS. POLLICK:  I just want to put that on

8  record, if you wouldn't mind.  Officer Springer said

9  sorry to Joe Loftus right now, so I would like that on

10 the record.

11         MR. GONZALES:  Put on the record that I

12 laughed while you're at it.

13         MR. LOFTUS:  Put on the record that

14 there was nothing I could do about the test.  It was an

15 arbitrator's award, so it had nothing to do with that.

16 BY MR. GONZALES:

17 Q.    Have you had a chance to review the document?

18 A.    Correct.  Yes.

19 Q.    You were asked questions from Mr. Holroyd about

20 a written document that you received from the union

21 concerning the details for the test.  Is this that

22 written document that you were referring to earlier?

23 A.    Yes.

24 Q.    At the bottom where there are the asterisks,

25 there's a sentence that says there is one other item

115

1  not mentioned here that will be coming around word of

2  mouth.  Do you see that?

3  A.    Um-hum.

4  Q.    What does that refer to?

5  A.    I don't know.

6  Q.    Was there something else that was discussed

7  after you received this document?

8  A.    I don't know.

9          MR. GONZALES:  That's actually the only

10 question I had about this document.  That's all the

11 questions I have.  Thank you.

12         MS. POLLICK:  All the questions, okay.

13 I have a few follow-up.

14              *  *  *

15         EXAMINATION

16 BY MS. POLLICK:

17 Q.    First of all, I'm going to show you what's been

18 marked as Garzella 7.  It is a copy of a borough of

19 Dunmore actual letterhead with Municipal Civil Service

20 Commission dated November 5th, 1987, addressed to

21 Anthony Cali.  And it's regarding the Civil Service

22 Commission.  Can you tell me, does it say, does this

23 document show that the elements are actually the

24 written score, the other elements, but it doesn't break

25 down the areas of the written test into elements?

116

1  A.    No.

2          MR. GONZALES:  I'm going to object to

3  that question for a couple of reasons.  First, you're

4  asking this witness to give an opinion about a document

5  that was created six years, five years before he even

6  started as a police officer with the borough of

7  Dunmore.  Plus --

8          MS. POLLICK:  These are speaking

9  objections.  By all means you can object and I won't

10 stop you from objecting, but speaking objections

11 are --

12         MR. GONZALES:  I'd also appreciate if

13 you wouldn't interrupt me.

14         MS. POLLICK:  And irrelevant.

15         MR. GONZALES:  The other is it's

16 leading.  You basically told the witness how to answer.

17 I can't stop you from leading.

18 A.    No.

19 Q.    It says the written test scores indicate that

20 you have passed the first element of the examination

21 process.  Your score and rank are written score 76.78,

22 correct?

23 A.    Correct.

24 Q.    And the next element of examination process is

25 the physical examination.  Isn't that also true?

117

1  A.    Correct.

2  Q.    So nowhere does it break down the written score

3  as to the math, grammar, reading and writing, correct?

4  A.    Correct.

5  Q.    And this is actually a borough of Dunmore

6  document, true?

7  A.    Correct.

8  Q.    I'm going to show you what's been marked as

9  Garzella 8, which also is a document from the borough

10 of Dunmore dated 1979 to Anthony Cali.  And this too if

11 you turn to the second page shows the scores of the

12 civil service test that Anthony Cali took at that time,

13 correct?

14         MR. GONZALES:  Same objection.  This

15 document is actually even older than the prior

16 document.  This officer was not a member of the borough

17 of Dunmore Police Department in 1979.  So I mean I'm

18 going to object to it.

19         MS. POLLICK:  Again, that's a speaking

20 objection, but by all means, you said it.

21 Q.    Can you answer the question?

22 A.    Yes.

23 Q.    And it does not -- here when we look at the

24 scores again it doesn't have the written test broken

25 down into math, reading, grammar, writing, true?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

118

1 A.   True.
2 Q.   And it has written, oral, average, correct?
3 A.   Correct.
4 Q.   Now, how many years have you been employed as a
5 police officer in Dunmore borough?
6 A.   It's like 14 years.
7 Q.   So 14 years after putting a bulletproof vest on
8 every day and patrolling, you were good enough to work
9 as a police officer, correct?
10 A.   Correct.
11 Q.   Now, the arbitrator award that came out, you
12 have no personal knowledge of any negotiation team and
13 what they were doing because the award came down,
14 correct?
15 A.   Correct.
16 Q.   And there is no restriction that you can't talk
17 to a Councilman and have a meeting with a Councilman if
18 you so choose as a police officer?
19 A.   Correct.
20 Q.   Do you feel it's okay to express your opinion
21 with a Council member without fear of being suspended
22 from the union?
23 A.   Yes.
24 Q.   Besides Anthony Cali, have you ever heard of
25 anyone being suspended from the union --

119

1 A.   No.
2 Q.   The union's there to help you and assist you
3 with your employment.  Is that your understanding?
4 A.   Yes.
5 Q.   And here the union has actually suspended a
6 member because of what they feel is wrongdoing in
7 connection with Anthony Cali?
8 A.   Yes.
9 Q.   Now, what's been marked as Garzella 1, which is
10 the Dunmore Civil Service Commission exam criteria,
11 this was given out the day of the exam?
12 A.   Correct.
13 Q.   And it wasn't given out a week before so you
14 could review it, it was given the day that you're
15 sitting there all nervous ready to take an exam?
16       MR. GONZALES:  Objection.  Asked and
17 answered.
18 A.   Correct.
19 Q.   Which your livelihood depended on?
20 A.   Correct.
21 Q.   And the union never once gave this to you
22 before so you could look at it?
23 A.   No.
24 Q.   And neither did anybody from the borough?
25 A.   No.

120

1 Q.   And even in this document that's handed the day
2 of the test, does it state that there are the areas of
3 the exam, writing, grammar and reading, are actually
4 elements?
5 A.   No.
6 Q.   Now, you'd agree with me that not all police
7 officers talk to Councilman Hennigan like you and
8 Anthony Cali?
9 A.   Correct.
10 Q.   So there is a difference in how you spoke out
11 against the exam?
12 A.   Yes.
13       MR. GONZALES:  Objection.  Leading.
14 Q.   And were you quite vocal in comparison to the
15 other people about having to take a civil service test?
16 A.   I was, yes.
17 Q.   So there is a difference there too, your
18 speech?
19 A.   Yes.
20 Q.   And the reason why -- why were you nervous
21 about taking the exam?
22 A.   Because I was afraid of failing it and then
23 losing my job because there was a lot of pressure on
24 us.
25 Q.   Is it also because you haven't been in school

121

1 in awhile?
2 A.   I've been out of school for 20 years.
3       MR. GONZALES:  Objection.  Leading.
4 Q.   Go ahead.
5 A.   I've been out of school for almost 20 years.
6 Q.   Now, is it true that no borough official,
7 borough or union representative has ever given you a
8 piece of paper prior to the exam stating that math,
9 reading, grammar and writing is an element?
10 A.   Correct.
11 Q.   Now, you in your career as a police officer and
12 having been a police officer 14 years, you have never
13 heard that a civil service test out there is based on
14 writing and grammar and that's how you have to pass it?
15 A.   Correct.
16 Q.   Your experience talking with the other police
17 officers is that it's always been an overall score?
18 A.   Correct.
19 Q.   So you can make up, if you don't do well in one
20 area, you can make it up in another?
21 A.   Correct.
22 Q.   Now, I'm going to refer you back to Garzella 7
23 and 8.  Can you explain to me why they don't have the
24 written scores broken down by elements?
25       MR. GONZALES:  Objection.  This is the

## ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

# TONY GARZELLA

122

1 one from '79 or '87?

2          MS. POLLICK: Both of them. I'm asking

3 could you explain to me why this borough of Dunmore

4 documents, why they do not break it down into grammar,

5 math --

6          MR. GONZALES: I want to hear this.

7 Q.    You can answer the question.

8 A.    I don't know.

9 Q.    And you can see that it's an average score

10 based on Garzella 8 because it's 82.7, one person has?

11 A.    Correct.

12          MR. GONZALES: Objection.

13 Q.    So the way the borough of Dunmore has done it

14 in the past, and we have proof of it by these

15 documents, is they have always done an overall on the

16 written score?

17 A.    Correct.

18 Q.    And certainly when a Councilman speaks, that's

19 someone that you would believe and there's no reason

20 why you would have to go and check on what he had to

21 say?

22 A.    Correct.

23 Q.    And one Councilman or Councilwoman is enough to

24 believe what transpired at a meeting?

25          MR. GONZALES: Objection.

123

1 A.    Correct.

2 Q.    And you actually summarized on Garzella 4 about

3 that Council meeting that you are aware of that you

4 described in your examination with Council on the

5 bottom?

6 A.    Correct.

7 Q.    Now, your understanding is that by filing a

8 grievance with your union you were actually filing a

9 grievance against the borough?

10 A.    Correct.

11 Q.    Now, talk about, tell us about the fact that

12 you found out you passed originally based on borough

13 representatives and then they said that you failed.

14 Tell me about that.

15 A.    I was told that I passed first and then a week

16 later after I was told I passed I was told that I

17 failed the test.

18 Q.    And did you hear of any other talk about that

19 one person was upset that everybody passed?

20 A.    Yes.

21 Q.    And tell us what that is.

22 A.    I heard that the manager, Loftus, was upset

23 because everybody had passed the test.

24 Q.    And then after finding out that they were

25 upset, you learned --

124

1          MS. POLLICK: And I want the record to

2 reflect that Joe Loftus is actually laughing as my

3 client is speaking during a serious deposition and it's

4 not appropriate.

5          MR. GONZALES: Why don't you just ask

6 the question and stop making comments, running

7 commentary about how everybody is acting? Your client

8 was certainly smiling during the answer as well.

9          MS. POLLICK: Well, I didn't see him

10 smiling. Did you smile?

11          THE WITNESS: I didn't smile.

12          MR. GONZALES: Of course you didn't.

13 You were looking at my client.

14          MS. POLLICK: I'm asking him if he's

15 smiling. I certainly want Judge Caputa to understand

16 the dynamics that's going on as we take this deposition

17 because I think that's important. So I am going to

18 note for the record different things and by all means I

19 would allow you to do the same.

20 BY MS. POLLICK:

21 Q.    How did you feel once you found out that you

22 passed?

23 A.    Good.

24 Q.    Tell us how you found out that a week later

25 somehow you mysteriously failed.

125

1 A.    I was on --

2          MR. GONZALES: Objection. You can

3 answer.

4 A.    I was on my honeymoon, I was actually on Miami

5 Beach and Anthony Cali called my cell phone and he had

6 told me that he had failed the test and that out of the

7 three guys that they were reporting failed, I was one

8 of them.

9 Q.    Now, that was your honeymoon, so that's a time

10 that you're supposed to enjoy your life?

11 A.    Yes.

12 Q.    It's supposed to come once or twice in a

13 lifetime, right?

14          MR. GONZALES: Objection.

15 A.    Correct.

16 Q.    And did it ruin your honeymoon?

17 A.    Absolutely.

18 Q.    Now, through your conversation with Councilman

19 Nardozi, you learned that the Council had moved to

20 either terminate you or lay you off?

21 A.    Correct.

22 Q.    And you deemed that -- how did you respond to

23 that?

24 A.    I was very upset.

25 Q.    And why?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

126

1  A.      Because I had passed the test and I knew that I
2  shouldn't have been in that predicament.
3  Q.      Now, as a result of the borough deeming you
4  failed, tell all the ways that your job is different.
5  A.      I don't receive a pension, I don't receive
6  nearly as much as the other guys would receive. I am
7  back down on the very last in seniority, so all the
8  experience that I had built up through the years is now
9  down at the bottom. Longevity is affected. I mean the
10 pension, retirement, there's a lot of things that are
11 affected by it.
12 Q.      Are your hours affected?
13 A.      Yes. They could be.
14 Q.      Because you're like low man on the totem pole?
15 A.      Yeah. For what I did ten years ago, I have to
16 do it all over again because now I have to go, if
17 somebody wants to be on day shift and I'm on day shift,
18 they can just go and take me out of day shift. And I
19 put 14 years in and there's a lot of people that only
20 put one or two years in. It's not like I was there --
21 I was working there full-time, even when I was
22 part-time, I was working full-time. There's only one
23 or two years that I probably actually only worked
24 part-time.
25 Q.      And actually after everybody, the seniority

127

1  shifted, you actually were put on midnights?
2  A.      Correct.
3  Q.      And you didn't like that?
4  A.      No.
5  Q.      That wasn't your desire?
6  A.      No.
7  Q.      And you were actually because of the seniority
8  shifts, you actually get the car that's not the in
9  charge car that you would have gotten had you been
10 promoted?
11 A.      Correct.
12 Q.      And that's a well known fact within the
13 community?
14 A.      Yes.
15 Q.      And now your seniority, has it affected like
16 when you want a vacation, when you want time off, is
17 that also affected now?
18 A.      Absolutely. Because we bid by seniority.
19 Q.      So how important is your seniority?
20 A.      Very important.
21 Q.      Do you consider it a significant benefit that
22 you now have lost?
23 A.      Absolutely.
24 Q.      Do you consider the fact that you were not
25 given the promotion because you passed the test, it

128

1  actually is a demotion in your eyes?
2  A.      Absolutely.
3  Q.      And the Council to your understanding did move
4  to terminate and lay you off after they deemed you
5  failing the test?
6  A.      Correct.
7  Q.      And you consider that retaliation?
8  A.      Yes.
9  Q.      And have you heard that the Council passed a
10 resolution that you had to be civil service passed in
11 order to remain employed?
12 A.      Yes.
13 Q.      Even in a part-time active -- excuse me, active
14 reserve capacity?
15 A.      Yes.
16 Q.      And do you deem that in retaliation for
17 challenging the test and speaking out and filing this
18 lawsuit?
19 A.      Yes.
20 Q.      Now, did the union make promises that they
21 wouldn't -- that your seniority would not be affected?
22 A.      Yes.
23 Q.      And tell me about that.
24 A.      We had a meeting with Attorney Jennings and
25 Attorney Jennings told us that -- he said that we had

129

1  to take the test and he told us, he said actually you
2  don't even have to take the test if you don't want to
3  take the test, but he said your seniority stays the
4  same. However, if there is a layoff, you will get laid
5  off first because you will be on the bottom of the
6  list. You will not be considered civil service. And
7  also if we didn't take the test, we wouldn't get into
8  the police pension. But he told us that we would keep
9  our seniority.
10 Q.      But that didn't happen?
11 A.      No.
12 Q.      The DPA failed to provide you with any type of
13 grievance hearing, correct?
14 A.      For the grievance, yes.
15 Q.      They held no hearing in connection with you,
16 the borough actually deeming you not passed?
17 A.      Correct.
18 Q.      And that's more evidence that you believe
19 supports your claim?
20 A.      Correct.
21 Q.      Now, the 18-3 vote that opposing counsel talked
22 with you about, that vote was -- what was that about?
23 Because that was separate and distinct from your
24 grievance.
25 A.      That was about filing grievance over the test

33 (Pages 126 to 129)

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

130

1 itself. That's the way it was put to me, the way I
2 understand it.
3 Q.     Was this after the test had occurred or before?
4 A.     After the test had occurred.
5 Q.     So this had nothing to do with you personally
6 asking the union to help you because you're different
7 than the 18?
8 A.     Correct.
9 Q.     And certainly the 18 who are going to jump
10 ahead of you aren't going to say oh, well, let's retest
11 here?
12 A.     Correct.
13          MR. GONZALES:  Objection.
14 A.     And I don't blame them, because I wouldn't want
15 to take a test over again either.
16 Q.     So they had reason, self interest to not
17 wanting to help you guys?
18 A.     Correct.
19 Q.     And you'd agree with me that the DPA did not
20 fight for you to get that job, that promotion?
21 A.     No.
22 Q.     And the president and the secretary actually
23 have now moved up in their jobs, aren't as in jeopardy
24 as they were before?
25 A.     Correct.

131

1 Q.     And we have heard a lot of publicity about that
2 Dunmore is always threatening to cut its budget and let
3 people go, so that is a major concern for people that
4 are in the police department, correct?
5 A.     Correct.
6 Q.     Who prompted the vote that occurred at that
7 meeting?
8 A.     Rich Barth ran that meeting.
9 Q.     Ran that meeting.  So you had not filed a
10 grievance at that point?
11 A.     No.
12 Q.     So again, it was something that the union
13 decided to do a vote on?
14 A.     Yes.
15 Q.     And it helped the union not having to grieve a
16 matter because the majority of people who passed it
17 didn't want to, right?
18 A.     Correct.
19 Q.     And sitting here today, you believe that the
20 union should have fought for you after you filed the
21 grievance regardless of the vote of the majority?
22 A.     Absolutely.
23 Q.     And now the union, those 18 people also if it's
24 deemed that the test was improperly given, improperly
25 scored, they have a lot to lose?

132

1 A.     Yes, they do.
2 Q.     Because you guys are going to jump to the top?
3 A.     Yes.
4 Q.     And the Dunmore Police Association, they had
5 some involvement on what test was going to be given
6 through the arbitration award?
7 A.     I would believe, but I don't know exactly.  I
8 wasn't involved in the negotiation with that aspect of
9 it.  So I wouldn't know.  I couldn't say if they had
10 any input.
11 Q.     The arbitration award actually just calls for
12 -- it doesn't specifically say what type of test it
13 was, and since everybody's full-time officers and
14 already shown that they can do the work, a simple test
15 could have --
16 A.     Exactly, yes.
17          MR. GONZALES:  Could have what?
18          MS. POLLICK:  Been given.
19 Q.     You understood that question, right?
20 A.     Yes.
21 Q.     Now, didn't union officials make comments to
22 the newspaper about the civil service test?
23 A.     I believe when the lawsuit was filed.
24 Q.     What was the comment made?
25 A.     That you had to be civil service to get a

133

1 full-time job in Dunmore.
2 Q.     And who made that comment?
3 A.     Officer Springer.
4 Q.     And how did that make you feel when your own
5 union's not even saying no comment, but yet commenting
6 and helping the borough?
7 A.     It hurt me.
8 Q.     And the DPA actually met with the Civil Service
9 Commission based on your understanding?
10 A.     Yes.
11 Q.     Now, the borough never gave you a hearing
12 before they in essence demoted you?
13 A.     No.
14 Q.     And they never gave you a hearing before you
15 were stripped from your seniority?
16 A.     No.
17 Q.     And the seniority stripping actually started
18 with the union?
19 A.     Correct.
20 Q.     And now the borough actually appoints the
21 commission members.  Do you understand that to be the
22 case?
23 A.     Yes.
24 Q.     So obviously the borough has a role in who they
25 could politically put in that position?

34 (Pages 130 to 133)

TONY GARZELLA

### 134

1 A.    Yes.
2        MR. GONZALES:  Objection.  You can
3 answer.
4 Q.    And Councilman Burke is the borough, in your
5 understanding, he is part of the borough?
6 A.    Yes.
7 Q.    And when you summarize what we've seen as
8 Garzella 5, your e-mail of March 13, 2005, when you
9 talk about what Burke was saying, he was telling you
10 that that's what Hennigan and Cummings wanted, it
11 wasn't his --
12 A.    Yes.
13 Q.    -- take on it?
14 A.    Yes.
15 Q.    Now, I'm going to show you what's been filed
16 an appeal to the arbitration award, so it wasn't set in
17 stone at that point?
18 A.    Correct.
19 Q.    Now, I'm going to show you what's been marked
20 as Garzella 6 which is the letter from Rich and Bill of
21 the union.  The second indented section it says the
22 Civil Service Commission is aware of our concerns about
23 certain Councilmen trying to manipulate the test and
24 assured us that they are doing everything they can to
25 keep politics out of the mix.  Do you know what he's

### 135

1 talking about there?
2 A.    That they want to keep the politicians away
3 from it.
4 Q.    But was there Councilmen that were after --
5 A.    Yes.
6        MR. GONZALES:  Were after what?  How did
7 you know what the question was?
8 Q.    What is your understanding of what I was trying
9 to get -- you can --
10 A.    That there was Councilmen involved in the civil
11 service process.
12 Q.    What were they -- this statement that's made
13 that they wanted, that the police are saying we're
14 concerned about certain Councilmen, what was the police
15 officer's concern?
16 A.    That Councilmen would be involved with the
17 civil service process.
18 Q.    How would that harm you?
19 A.    Because it wouldn't be fair and then they would
20 be able to do whatever they want.
21 Q.    And in the second, the third indented
22 paragraph, it says Joe Loftus was extremely unhappy
23 about this and yet he could not or, comma, would not
24 give a reasonable account of why the borough was trying
25 to give an open test.  Is that what the document

### 136

1 states?
2 A.    Yes.
3 Q.    And then two down it says the test will be 70
4 percent written and 30 percent oral.  Correct?
5 A.    Correct.
6 Q.    And even Rich and Bill state the test will be
7 83 minutes in length and cover the following areas,
8 basic math, reading, grammar and writing, correct?
9 A.    Correct.
10 Q.    They didn't use the word following elements,
11 did they?
12 A.    No.
13 Q.    And the second to last documentation or
14 paragraph, we ask the commission to consider revising
15 the procedures so that any man who does not pass the
16 written would have the opportunity to make it up in the
17 oral portion of the test.
18 A.    Yes.
19 Q.    Now, originally it was supposed to be written
20 and oral, right?
21 A.    Yes.
22 Q.    But somehow mysteriously the commission said no
23 orals were needed?
24        MR. GONZALES:  Objection.
25 A.    Correct.

### 137

1 Q.    Do you know why?
2 A.    No.
3        MR. GONZALES:  It's a mystery.  How
4 would he know?
5        MS. POLLICK:  He might know the answer
6 to the mystery.  The Hardy Boys, you know.  Some people
7 know.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

138

140

1 against the borough. Did I understand that answer to
2 be correct? That's what you said?
3 A.    Correct.
4 Q.    What is the basis for your opinion of that?
5 A.    I believe if I filed the grievance with the
6 union, it was against the borough also.
7 Q.    Based on what?
8 A.    Because the union is part of the Dunmore
9 borough as one entity, but I mean they're separate, but
10 it's still showing some kind of action against the
11 test.
12 Q.    Is there a document that you're referring to
13 that you base that information on?
14 A.    No.
15 Q.    What does your collective bargaining agreement
16 say about that?
17 A.    I don't know. I'd have to look it up.
18 Q.    I have a copy. Would you agree with me that
19 you would look to the collective bargaining agreement
20 to see what your rights would be in filing a grievance?
21          MS. POLLICK: Objection. Calls for
22 speculation.
23 Q.    You can answer the question.
24 A.    The process that we follow is to file the
25 grievance with the union.

139

          * * *
2          RE-EXAMINATION
3 BY MR. GONZALES:
4 Q.    What is the in charge car?
5 A.    That's the -- it's the supervisor car. It's
6 usually the newest car in the fleet.
7 Q.    So whoever is the OIC in charge of a particular
8 shift gets to drive a certain car?
9 A.    Correct.
10 Q.    And you don't get to drive that car anymore?
11 A.    No.
12 Q.    That upsets you?
13 A.    No. I mean it's -- it does, yeah, but I mean
14 just because when you first start as a policeman,
15 you're usually getting the car that's the lowest one in
16 the fleet, you know what I mean? But I'm not going to
17 lose sleep over it overnight if I have to drive it.
18 You know what I mean? But once you get to a certain
19 point, you should have a better car when your seniority
20 is there.
21 Q.    So you haven't lost any sleep over that. Is
22 that correct?
23 A.    Correct.
24 Q.    You said something about filing a grievance
25 against the union was the same as filing a grievance

141

1 Q.    That's not my question. My question is would
2 you agree with me that you would look to the collective
3 bargaining agreement to determine what procedure you
4 would follow in filing a grievance?
5          MS. POLLICK: Objection. Asked and
6 answered.
7          MR. GONZALES: He didn't answer it.
8          MS. POLLICK: Yes, he did.
9 Q.    Can you please answer it again?
10 A.    I'd follow what -- follow it through with the
11 union representatives.
12 Q.    Was that a yes or a no?
13 A.    Yes. I need water.
14          MR. GONZALES: Why don't we take a break
15 and get a drink of water.
16          (Short recess.)
17          MS. POLLICK: Do you want to make a copy
18 if you're going to mark it as an exhibit?
19          MR. GONZALES: I don't know if I'm going
20 to mark it as an exhibit. I don't know if I'm going to
21 mark it as an exhibit yet.
22          MS. POLLICK: If you're going to show
23 it, let me read it before you show it to my client.
24          MR. GONZALES: I guess I'll have to make
25 a copy.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

142

1          (Short recess.)
2    BY MR. GONZALES:
3    Q.    I've marked as Garzella 9 a copy of the
4    collective bargaining agreement which would contain the
5    grievance procedures that would be in effect under the
6    current arbitration award.
7          MS. POLLICK:   Objection.   Calls for
8    speculation.   Assumes facts not in evidence.
9    Q.    Right?   Do you know?
10   A.    Yes.
11   Q.    Yes, this is?
12   A.    Yes.
13   Q.    So if I were to look for the document that
14   would identify what grievance procedures would be
15   available to a police officer in the borough of
16   Dunmore, I would look at Garzella 9.   Is that correct?
17         MS. POLLICK:   Objection.   Calls for
18   speculation.
19   O.    Is that a yes or a no?
20   A.    Yes.
21   Q.    Let's turn to article 18.   Now, if there's
22   another portion of this collective bargaining agreement
23   that you think that we should look to, let me know.
24   But I think it's article 18.   Is that your
25   understanding?

143

1    A.    Yes.
2    Q.    And it's titled what?
3    A.    Grievance and arbitration procedure.
4    Q.    Now, it is your understanding that if you file
5    a grievance with the union that is enough, you don't
6    have to file another grievance with the borough.   Is
7    that your understanding?   That was your testimony when
8    your attorney asked.
9    A.    Yes.
10   Q.    Please point out to me where it says that in
11   article 18.
12   A.    It doesn't.
13   Q.    I'm sorry?
14   A.    It doesn't say it.
15   Q.    Is there some other document that's out there
16   that says that?
17   A.    Not that I know of.
18   Q.    So I mean according to this document, would you
19   agree with me under section 2 if you had a grievance
20   concerning any treatment under collective bargaining
21   agreement, which would include the testing, correct?
22   A.    Correct.
23         MS. POLLICK:   Objection.   Assumes facts
24   not into evidence.
25   Q.    Under section 2, you have the right to file a

144

1    grievance with the borough, correct?
2    A.    Um-hum.
3    Q.    Yes?
4    A.    Yes.
5    Q.    And it tells you the way to do that would be to
6    file with Borough Council by giving a copy of the
7    grievance to the borough manager and the Borough
8    Council president.   Is that correct?
9    A.    Correct.
10   Q.    Did you at any time give a copy of a grievance
11   to the borough manager or the Borough Council president
12   concerning the test?
13   A.    No, because we gave it to the union officials
14   first.
15   Q.    Did you ever give a copy of a grievance to the
16   borough manager or the Borough Council president
17   concerning the civil service test?
18   A.    No.
19   Q.    Did you ever give a copy of the grievance, any
20   grievance, concerning your seniority to the borough
21   manager or the Borough Council president in accordance
22   with article 18 of the collective bargaining agreement?
23   A.    No, not myself.   No.
24   Q.    Did anyone on your behalf file a grievance with
25   the borough manager or the Borough Council president?

145

1    A.    Just when we filed the grievances with the
2    union.   I don't know if they gave them copies of them.
3    Q.    Go ahead.
4    A.    I didn't give them anything, no.
5    Q.    That was delivered by Officer Cali, correct?
6    A.    I would believe so, yes.
7    Q.    And it was your understanding that he delivered
8    that grievance to the union, not to the borough manager
9    or the Borough Council president.   Isn't that correct?
10         MS. POLLICK:   Objection.   Assumes facts
11   not into evidence.
12   A.    Correct.
13   Q.    Now, you testified that you were told that you
14   passed the test first.   Is that correct?
15   A.    Um-hum.
16   Q.    That's a yes?
17   A.    Yes.
18   Q.    First let's go back.   When did you go on your
19   honeymoon?
20   A.    I can't tell you the date for sure.   It was in
21   May sometime.
22   Q.    Was it the same weekend you got married?
23   A.    I think it was maybe the beginning of May.   No.
24   It was way after I got married.
25   Q.    You took the test on May 21st, correct?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**TONY GARZELLA**

146

1  A.    Correct.
2  Q.    When was the first time you were notified
3  whether you passed or you failed?
4  A.    I'd say the Saturday that I was on the ship in
5  New York City.
6  Q.    Was that part of your honeymoon?
7  A.    That's where we left from.  It was a cruise.
8  Q.    It was a cruise?
9  A.    Yes.
10 Q.    Who notified you?
11 A.    I was notified by Anthony Cali and I was also
12 notified by Paul Nardozi.
13 Q.    What did they tell you?
14 A.    They said that everybody had to pass the test
15 -- had passed the civil service test.  That was what
16 was going around.
17 Q.    Do you have any records that you could look at
18 to figure out what day that Saturday was?
19 A.    I would have to see when I was in New York, I
20 mean the time of the cruise.
21 Q.    Right.  You were on board the ship when you got
22 the call?
23 A.    Yes.
24 Q.    Was it a telephone call to your cell phone?
25 A.    Cell phone.

147

1  Q.    So you're still close enough that you were able
2  to get cell phone service?
3  A.    Yeah.
4  Q.    Who called you first, Cali or --
5  A.    I don't remember.  I don't remember.
6  Q.    You got two separate phone calls?
7  A.    Yes.
8  Q.    Did you receive any written document or
9  notification that you had passed the test?
10 A.    No.
11 Q.    Did you receive any call from any member of the
12 Civil Service Commission that you had passed the test?
13 A.    No.
14 Q.    Did you receive a call from the borough manager
15 that you passed the test?
16 A.    No.
17 Q.    Did you receive a call from Frank O'Neill, the
18 solicitor for the Civil Service Commission, that you
19 had passed the test?
20 A.    No.
21 Q.    So the only knowledge you had that you passed
22 the test was a phone call from Officer Cali and a phone
23 call from Councilman Nardozi?
24 A.    Correct.
25 Q.    Now, when did you find out that the borough

148

1  failed -- strike that.
2         When did you find out that you failed
3  the test?
4         MS. POLLICK:  Objection.  Assumes facts
5  not in evidence.
6  Q.    I know the objection that you say you didn't
7  fail, but when were you notified by the borough -- let
8  me ask the question clearly.
9         When were you notified by the borough
10 that you failed the test?
11        MS. POLLICK:  Same objection.
12 A.    By the borough would be I think it was around
13 June 7th or 8th, I guess.
14 Q.    And that's the letter that you got that we
15 marked previously as Garzella --
16 A.    Yeah, because the wrong address was on it.  An
17 old address was on it.  That's why I didn't get it.
18 Q.    Garzella 2?
19 A.    Yeah.
20 Q.    Now, before June 7th -- and you were back from
21 your honeymoon on June 7th, I assume, correct?
22 A.    Um-hum.
23 Q.    Yes?
24 A.    Yes.
25 Q.    Before June 7th you got another phone call from

149

1  Officer Cali saying that you failed?
2  A.    Yes.
3  Q.    Where were you when you got that phone call?
4  A.    Miami Beach on the beach.  The ship pulled into
5  Miami.
6  Q.    What did he tell you?
7  A.    He said that he had received a letter from the
8  Civil Service Commission and he had failed the test
9  because he failed a section in there and he said that I
10 was one of the guys that failed too.  I mean he knew.
11 I don't know how he knew, but he knew that I failed.
12 Q.    Did you ask him how he knew?
13 A.    I don't know if I did or not.  I can't
14 remember.
15 Q.    Do you have any knowledge, first hand
16 knowledge, that anyone from the borough changed the
17 scores between the time you got the phone call from
18 Cali in New York City to the time you got the phone
19 call from Cali down in Miami Beach?
20 A.    No.  It was -- no.
21 Q.    Now, who told you that Joe Loftus was upset
22 that everybody passed the test?
23 A.    I believe it came from Anthony Cali.
24 Q.    You never talked to Mr. Loftus about the
25 outcome of the test, did you?

38 (Pages 146 to 149)

## TONY GARZELLA

150

1  A.    No. I was away.
2  Q.    When did Officer Cali tell you that?
3  A.    It had to be that -- it was on a Saturday
4  before when I was on the ship, so I'd probably be able
5  to know the exact date when I find out when the ship
6  left.
7  Q.    It was during that first phone call you had
8  with Officer Cali?
9  A.    Correct.
10 Q.    Did he tell you anything else about Mr. Loftus?
11 A.    Hum-um.
12 Q.    That's a no?
13 A.    Just that he was upset that he would have to
14 pay a bunch of expensive cops now.
15 Q.    Did he tell you how he knew Loftus said that?
16 A.    I think he heard it from Paul Nardozi.
17 Q.    You had testified that you were quite vocal in
18 complaining about having to take the test. Do you
19 remember using that term?
20 A.    Yes.
21 Q.    I guess your attorney used the term. But how
22 were you different than the other officers that were
23 complaining about taking the test? What did you do
24 differently?
25 A.    I was just being vocal in front of them because

151

1  I didn't feel -- I was one of the older guys there and
2  you see all these other people come in and I mean the
3  firemen were just -- they're civil service, they enjoy
4  a pension, they enjoy every benefit. There's some guys
5  that paid a dollar to become civil service, you know.
6  And I was like we're sacrificing our lives here for all
7  these years and now they're going to make us take a
8  test and, you know, it's ridiculous because if you fail
9  the test, you're done, you're gone.
10 Q.    Right. When I asked you about this, you said
11 that pretty much everybody in the department was
12 complaining about taking the test. Remember that?
13 A.    Yes. They were.
14 Q.    And then your attorney asked you the question
15 and you said you were more vocal than the other
16 officers.
17 A.    Well, I think there were some officers that
18 they knew they were good test takers and they weren't
19 as bothered by it as I was.
20 Q.    I understand that. But my question is were you
21 as vocal as other officers or less vocal or more vocal?
22 A.    There was some officers that were even more
23 vocal than me.
24 Q.    Who were they?
25 A.    I know Anthony Cali was, Billy Bonavoglia was,

152

1  Ray Reynolds was vocal on it. I mean I can't think of
2  anybody else that I really, you know.
3  Q.    So those officers that you named were more
4  vocal than you. Were there any other officers that
5  were as vocal as you in complaining about the test?
6  A.    Yes.
7  Q.    About how many of those were there?
8  A.    At least five or six.
9  Q.    Now, in answering a question from your
10 attorney, she asked you how your job was different now
11 and you testified that you didn't receive a pension,
12 you're not paid as much and you lost seniority. Before
13 you took the test, did you receive a pension?
14 A.    No.
15 Q.    And after you took the test, you don't receive
16 a pension, correct?
17 A.    No.
18 Q.    Before you took the test, were you paid as much
19 as full-time officers were paid?
20 A.    No.
21 Q.    And after you took the test, are you paid as
22 much as the full-time officers?
23 A.    No.
24 Q.    Before you took the test, did you have the same
25 seniority as full-time officers?

153

1  A.    Yes.
2  Q.    As a reserve officer you had the same seniority
3  as full-time members?
4  A.    Yeah. We're all the same in seniority. But I
5  mean there was nobody that was -- the full-timers were
6  already there. I wasn't over a full-timer.
7  Q.    That's my question. Before you took the test,
8  did you have seniority over the full-timers?
9  A.    No.
10 Q.    After the test, do you have seniority over the
11 full-timers?
12 A.    No.
13 Q.    Again in answering a question from your
14 attorney, you said that Council moved to terminate you
15 or lay you off. I thought when I asked you those
16 questions you had no first hand knowledge what Council
17 did.
18        MS. POLLICK: Objection.
19 Mischaracterization of prior testimony.
20 A.    I said that's what I was told.
21 Q.    So you have no first hand knowledge whether
22 Council moved to terminate or lay you off at all?
23 A.    No.
24 Q.    And you've never since -- you've never seen any
25 documents that suggest that there was a motion to

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

154

1 terminate you?
2 A.    No, I did not.
3 Q.    Certainly there was no motion that passed to
4 your knowledge because you were never terminated?
5 A.    Correct.
6 Q.    And you've never been laid off since the test,
7 have you?
8 A.    No.
9         MR. GONZALES:  Those are all the
10 questions I have.  Thanks.
11        MR. HOLROYD:  I have nothing else.
12              * * *
13             RE-EXAMINATION
14 BY MS. POLLICK:
15 Q.    I have a few.  That threat of termination
16 existed ever since you took the test, still sitting
17 here today?
18 A.    Correct.
19 Q.    So that threat has almost been for over a year
20 you lived with every single day of your life?
21 A.    Um-hum.  Yes.
22 Q.    Now, Billy Bonavoglia and the Reynolds officer,
23 he never met with Hennigan?
24 A.    No.
25 Q.    So that is what makes you different than the

155

1 other police officers, you and Cali met with him?
2 A.    Yes.
3 Q.    Now, if the borough had administered the test
4 correctly, you would have gotten into the pension?
5 A.    Yes.
6        MR. GONZALES:  Objection.
7 Q.    Because they didn't administrate it correctly,
8 you lost that benefit?
9        MR. GONZALES:  Objection.
10 A.    Yes.
11 Q.    You lost your seniority because they didn't --
12 A.    Yes.
13 Q.    -- do the test correctly?
14 A.    Correct.
15 Q.    Now, the active reserves who took the test in
16 the borough and said that they passed, they have now
17 jumped ahead of you, so you've suffered there?
18 A.    Correct.
19 Q.    Now, the collective bargaining agreement which
20 was marked as Garzella 9, you'd agree with me if you
21 can do under article 3, union rights, it has the
22 borough shall allow designated union officers to
23 perform the following duties without loss of pay during
24 scheduled work hours.  Number one, investigate and
25 process police officer grievances, correct?

156

1 A.    Correct.
2 Q.    And it's your understanding that how the union
3 has operated is that they, the union, you give them the
4 grievance and they take care of it?
5 A.    Correct.
6 Q.    Has that always been in the past?
7 A.    Yes.
8 Q.    Has anyone ever had to go to the borough or
9 Borough Council and provided a copy of the letter?
10 A.    No, not that I know of.
11 Q.    Excuse me, not letter.  Grievance.
12 A.    Not that I know of.
13 Q.    Now, if you can look to article 21, page 11, if
14 you can look, does it not say section 1, this agreement
15 shall continue in full force and effect through
16 December 31st, 1997, thereafter it shall automatically
17 renew itself and continue in full, quote, force and
18 effect until modified by agreement between the parties
19 or an arbitration award in accordance with the
20 provisions of Act 111.  Does it not state that?
21 A.    Yes.
22 Q.    So the minute the arbitration award came down,
23 did it -- do you know if this was still in place, this
24 agreement as we speak?
25 A.    Yes.

157

1 Q.    Are you sure about that?
2 A.    I would imagine, yes.
3        MR. GONZALES:  Objection.
4 Q.    Well, doesn't it say that it would -- that it
5 continues in full force until an arbitration award?
6 A.    Okay.
7 Q.    Is that what -- like does that --
8 A.    I'm missing the point here.
9        MR. GONZALES:  Objection.  I'm going to
10 stop this.  Because now you're telling your witness
11 what to say and not only are you telling him what to
12 say, what you're telling him is wrong.
13        MS. POLLICK:  You can say whatever you
14 want.  By all means put your objections on the record.
15 I'm allowed to ask any question I want.
16        MR. GONZALES:  What are you doing?  This
17 is totally inappropriate.
18        MS. POLLICK:  Place an objection to form
19 each and every time I ask a question, by all means you
20 can do that.
21        MR. GONZALES:  I have, but you're
22 telling the witness what to say.  You're giving him
23 advice.
24        MS. POLLICK:  No, I'm not.  I'm asking
25 him a question.  Do you have any further objections?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

## TONY GARZELLA

158

1    MR. GONZALES: I might once you ask
2 another question.
3 Q.    Does it say it shall automatically renew itself
4 and continue in full effect until modified by agreement
5 between the parties or an arbitration award?
6    MR. GONZALES: Asked and answered
7 already.
8 Q.    Do you know what that actually means as a union
9 person?
10 A.    Yeah, if the contract does expire, it will
11 still follow through, like it will still renew itself.
12 Q.    Has anyone ever provided any training to you on
13 this collective bargaining agreement on how each
14 section is interpreted?
15 A.    No.
16 Q.    Who would have -- do you know what each and
17 every section means technically?
18    MR. GONZALES: Objection.
19 A.    I got an idea, but I mean they're hard to read
20 and understand.
21 Q.    Okay. If this agreement was in effect, can you
23 arbitration award, why that was, why that came down?
24 You can answer the question.
25 A.    It came down because that's what was won.

159

1 Q.    Did you know why the arbitration was actually
2 going on?
3 A.    Because the last contract was expired.
4 Q.    And when was the last contract?
5 A.    I don't know exactly the year. Maybe '98. I
6 don't know when it -- the last one expired. I'd have
7 to look.
8 Q.    And this one the grievance was until 1997,
9 correct?
10 A.    Correct.
11 Q.    It's now 2006.
12 A.    Correct.
13 Q.    So sitting here today, do you know for a fact
14 that this document that opposing counsel gave you was
15 the agreement that the borough had to follow?
16 A.    Yes.
17 Q.    How do you know that?
18    MR. GONZALES: No matter how many times
19 you ask him, he's going to give you the same answer
20 because it's the truth.
21    MS. POLLICK: You can by all means place
22 objections on the record.
23    MR. GONZALES: I have, but this is
24 inappropriate. You want him to say that it's not in
25 effect. It is in effect. No matter how you ask the

160

1 question or how you try and shade the questions or tell
2 your client how to answer, he's still going to tell the
3 truth. This is what's in effect.
4 Q.    Do you know for 100 percent certainty sitting
5 here today that this is the -- paragraph by paragraph,
6 that this is the agreement that's in effect?
7 A.    No.
8 Q.    And you said that you believe the last
9 agreement was in 1998, something like that?
10 A.    I don't know exactly when it expired, when it
11 was done.
12 Q.    Is there any possibility that you've been
13 working eight years without a contract?
14 A.    No.
15 Q.    So knowing that this isn't the one that you had
16 for nine years, do you know that this was actually the
17 process that you use?
18 A.    No.
19 Q.    Now, by not -- I know counsel was kind of
20 mocking you about having problems -- about having an
21 issue with having to get into a different vehicle than
23    MR. GONZALES: Whoa. Time out. I'm not
24 mocking anybody. I'm asking questions of a witness and
25 don't mischaracterize the way I was acting, please.

161

1    MS. POLLICK: I will state whatever I
2 want for the record. By all means place your objection
3 on the records.
4    MR. GONZALES: I am. But I'm not
5 mocking anybody.
6 Q.    Does it show the community that you've actually
7 dropped in rank?
8 A.    Yes.
9 Q.    And although -- that's publicly humiliating to
10 you, do you find that humiliating?
11 A.    Yes. Yes.
12 Q.    Why?
13 A.    Because I would be higher up in the scale and I
14 wouldn't be -- I'm usually in charge, most of the time
15 I was in charge.
16 Q.    Does it have any fact to do with that you've
17 been working there for 14 years?
18 A.    Yes.
19    MR. GONZALES: I think we've established
20 he's worked there for 14 years.
21    MS. POLLICK: If you want to place
22 proper objections on the record, you can. But that's a
23 comment.
24    MR. GONZALES: You're asking the same
25 questions over and over. We've already heard this.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

# TONY GARZELLA

162

1          MS. POLLICK:  By all means, you got to
2  do what you got to do.
3  Q.     Has the borough provided any hearing concerning
4  your -- what you consider demotion or stripping of your
5  seniority?
6          MR. GONZALES:  You already asked him
7  this.
8  Q.     You can answer the question.
9  A.     No.
10 Q.     And to your understanding, the proper protocol
11 for filing a grievance is you provide it to your
12 counsel -- I mean to your union representative?
13         MR. GONZALES:  Objection.  Asked and
14 answered.
15 A.     Yes.
16 Q.     And have you ever filed a grievance on any
17 other occasion besides the ones that you filed in 2005
18 any time in your 14 years?
19 A.     I never did, no.
20 Q.     Has anyone you know filed a grievance in those
21 -- in the last two years?
23 Q.     Did they provide the grievance to the union
24 officials?
25 A.     Yes.

163

1  Q.     And is that how the borough received it?
2  A.     Yes.
3  Q.     And who is that?
4  A.     Either Rich Barth or Billy Springer.
5  Q.     I mean the officer that filed a grievance
6  besides yourself and Cali.
7  A.     I think Anthony Cali filed one and I think Sal
8  Marchese has filed one in the last couple months.  It
9  might be a little longer, I'm not sure.
10 Q.     Do you deem it like past practice for the union
11 to help you with filing the grievance?
12 A.     Yes.
13         MS. POLLICK:  Nothing further.
14         MR. GONZALES:  I'm done.
15         (Concluded at 1:15 p.m.)
16
17
18
19
20
21
22
23
24
25

164

_____, 2006


          I hereby certify that the evidence
and proceedings are contained fully and accurately in
the notes taken by me of the testimony of the within
witness who was duly sworn by me, and that this is a
correct transcript of the same.


          _____
          Wendy Engler Shade, RDR, CRR
          Registered Diplomate Reporter
          Certified Realtime Reporter
          Notary Public



The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**